# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: GENERIC PHARMACEUTICALS PRICING ANTITRUST LITIGATION | MDL No. 2724<br>No.  16-MD-2724<br>HON. CYNTHIA M. RUFE |
| _____ | |
| IN RE:  CLOMIPRAMINE CASES | |
| _____ | |
| THIS DOCUMENT RELATES TO: | |
| *ALL INDIRECT RESELLER PLAINTIFF (IRP) ACTIONS* | 16-CM-27243 <br><br> **CLASS ACTION** <br> **JURY TRIAL DEMANDED** |

## INDIRECT RESELLER PLAINTIFFS'

## CLASS ACTION COMPLAINT

## TABLE OF CONTENTS

PAGE

I.     NATURE OF THE ACTION ........................................................................... 1

II.    ONGOING INVESTIGATIONS .................................................................... 4

III.   THE ROLE OF INDEPENDENT PHARMACIES ......................................... 8

IV.    JURISDICTION AND VENUE ..................................................................... 9

V.     PARTIES…………………………………… ............................................ 10

    A.     Plaintiffs .......................................................................................... 10

    B.     Defendants ....................................................................................... 11

    C.     Co-conspirators ............................................................................... 12

VI.    INTERSTATE COMMERCE ....................................................................... 12

VII.   BACKGROUND ON THE GENERIC DRUG INDUSTRY ......................... 13

    A.     Generic drugs are commodity products that compete on price ........... 13

    B.     Pricing of generic drugs discourages unilateral price increases ........... 16

VIII.  THE GENERIC CLOMIPRAMINE CONSPIRACY ..................................... 19

    A.     Congressional responses to generic Clomipramine price increases ....... 19

    B.     The generic Clomipramine market ..................................................... 20

    C.     Defendants conspired to increase the price of Clomipramine ............... 21

    D.     Defendants had many opportunities to conspire on Clomipramine ........ 30

    E.     Defendants' concerted efforts to increase prices for generic Clomipramine
        yielded supracompetitive profits ......................................................... 32

    F.     The Clomipramine market is susceptible to collusion ........................... 33

        1.     Industry concentration ........................................................... 33

        2.     Barriers to entry .................................................................... 34

        3.     Inelasticity demand ................................................................ 35

        4.     Lack of substitutes ................................................................. 36

        5.     Standardized product ............................................................. 36

        6.     Inter-competitor contacts and communications ........................ 37

IX.  THE STATUTES OF LIMITATIONS DO NOT BAR PLAINTIFFS' CLAIMS ............... 43

    A.  The statutes of limitations did not begin to run because Plaintiffs did not and could not discover Defendants' unlawful conspiracy .............................................. 43

    B.  Active concealment tolled the statutes of limitations ............................................. 45

        1.  Active concealment of the conspiracy ............................................................ 45

        2.  Plaintiffs exercised reasonable diligence ...................................................... 47

X.  CONTINUING VIOLATIONS .......................................................................................... 47

XI.  DEFENDANTS' ANTITRUST VIOLATIONS................................................................. 48

XII.  CLASS ACTION ALLEGATIONS .................................................................................. 49

XIII. CAUSES OF ACTIONS .................................................................................................... 53

XIV. PRAYER FOR RELIEF .................................................................................................... 96

XV.  JURY DEMAND ............................................................................................................... 98

# I.    <u>NATURE OF THE ACTION</u>

1.      This suit brings claims on behalf of indirect purchasers of generic Clomipramine ("Indirect Reseller Plaintiffs," "independent pharmacies," or "Plaintiffs") for injunctive relief and to recoup overcharges that resulted from an unlawful agreement among Defendants to allocate customers, rig bids, and fix, raise and/or stabilize the prices of generic Clomipramine.

2.      Clomipramine is a tricyclic antidepressant that is commonly used to treat obsessive-compulsive disorder, reducing the recurrence of intrusive thoughts and the urge to perform repeated tasks.  Over three million people suffer from OCD in the United States.  Treatment typically consists of daily consumption of an oral tablet form of Clomipramine (25mg, 50mg, or 75mg), with the total dosage ranging from 25mg to 250mg per day.  Patients diagnosed with OCD will typically require treatment for extended periods of time.  The World Health Organization includes Clomipramine on its core list of essential medicines, which are medicines necessary to meet the minimum needs for a basic health-care system.

3.      For years, competition among sellers of generic Clomipramine kept prices stable, at low levels.  But starting in May 2013, Defendants, who dominate the market for Clomipramine, abruptly and inexplicably raised prices.  The price increases were extreme and unprecedented, skyrocketing in sync, and generic Clomipramine prices remain at elevated levels today.  In fact, the U.S. Government Accountability Office ("GAO") identified Clomipramine as having "experienced an extraordinary price increase."[1]

---

[1] GAO Report to Congressional Requesters, *Generic Drugs Under Medicare* (Aug. 12, 2016) ("GAO Report"), at Appx. III, *available at* <u>http://www.gao.gov/products/GAO-16-706</u>

4.    Defendants' unlawful and anticompetitive conduct in the Clomipramine market is part of a larger conspiracy or series of conspiracies involving numerous generic pharmaceuticals and pharmaceutical manufacturers.

5.    The price increases imposed by Defendant manufacturers of generic Clomipramine cannot be explained by supply shortages or any other market feature or shock.  Nor were they the result of unilateral business decisions.    Instead, the significant increases in the prices of Clomipramine were the result of an illegal agreement among Defendants to fix prices.

6.    As alleged below, Defendants implemented their conspiracy through numerous secret meetings and communications, including trade association meetings held by the Generic Pharmaceutical Association ("GPhA") (now the Association for Accessible Medicines), the National Association of Chain Drug Stores ("NACDS"), ███████████████████

███████████████████████████████████████

█████████████████████

7.    Extreme and unprecedented price increases in the generic drug industry—like those imposed by manufacturers of Clomipramine —have prompted close scrutiny of the industry by the U.S. Congress, federal and state enforcement agencies, and private litigants.

8.    An ongoing criminal investigation by the Antitrust Division of the U.S. Department of Justice ("DOJ") has, to date, resulted in price-fixing guilty pleas from two senior executives at Heritage Pharmaceuticals, Inc. relating to the sale of doxycycline hyclate and glyburide.  But DOJ has made clear that its "investigation is ongoing"[2] and the evidence uncovered during the course

---

[2] DOJ, Division Update Spring 2017 (Mar. 28, 2017), *available at* https://www.justice.gov/atr/division-operations/division-update-spring-2017/division-secures-individual-and-corporate-guilty-pleas-collusion-industries-where-products

of its investigation into those drugs also "implicates . . . a significant number of the Defendants . . . [and] a significant number of the drugs at issue" in this Multidistrict Litigation.[3]

9.    The Attorney General for the State of Connecticut ("Connecticut AG"), whose office has been pursuing an investigation of the generic drug industry parallel to that of DOJ, confirms that its price-fixing investigation extends "way beyond the two drugs and the six companies. Way beyond. . . . We're learning new things every day."[4] There is "compelling evidence of collusion and anticompetitive conduct across many companies that manufacture and market generic drugs in the United States . . . [and] evidence of widespread participation in illegal conspiracies across the generic drug industry."[5]

10.    Manufacturers of generic Clomipramine are implicated in these ongoing investigations; each of the Defendants named here—including Mylan, Sandoz, and Taro—have received a federal grand jury subpoena and/or an investigative demand from the Connecticut AG as part of the generic drug price-fixing investigations.

11.    Plaintiffs have paid many millions of dollars more than they would have in a competitive market for generic Clomipramine.

12.    Plaintiffs bring this action against Defendants on account of their past and ongoing violations of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3) and the state laws set forth below. Plaintiffs bring this action both individually and on behalf of (a) a national injunctive class of all privately held pharmacies in the United States and its territories that indirectly purchased

---

[3] Intervenor United States' Motion to Stay Discovery at 1-2 (May 1, 2017) (ECF No. 279).

[4] "How Martinis, Steaks, and a Golf Round Raised Your Prescription Drug Prices," Kaiser Health News (Dec. 21, 2016) *available at* http://www.thedailybeast.com/how-martinis-steaks-and-a-golf-round-raised-your-prescription-drug-prices

[5] Connecticut AG, Press Release (Dec. 15, 2016) *available at* http://www.ct.gov/ag/cwp/view.asp?Q=588538&A=2341

generic Clomipramine products manufactured by any Defendant, from May 1, 2013 to the present ("Class Period"), and (b) a damages class of all privately-held pharmacies in certain states that indirectly purchased generic Clomipramine products manufactured by any Defendant, from May 1, 2013 to the present.

## II.    <u>ONGOING INVESTIGATIONS</u>

13.    Now in its third year, the federal criminal investigation into generic drug price-fixing has begun to bear fruit. On December 12 and 13, 2016, DOJ filed criminal charges against former Heritage executives Jeffrey Glazer (CEO) and Jason Malek (President). The government alleged that they conspired with others "to allocate customers, rig bids, and fix and maintain prices" of glyburide and doxycycline hyclate in violation of the Sherman Act (15 U.S.C. § 1).[6]

14.    On January 9, 2017, Glazer and Malek pleaded guilty to those charges.[7] Deputy Assistant Attorney General Brent Snyder of the Justice Department's Antitrust Division explained: "These charges are an important step in correcting that injustice and in ensuring that generic pharmaceutical companies compete vigorously to provide these essential products at a price set by the market, not by collusion."[8] As they await sentencing, Glazer and Malek are cooperating with DOJ's continuing investigation. More criminal charges and guilty pleas are expected to follow.[9]

---

[6] Information ¶ 6, United States v. Glazer, No. 2:16-cr-00506-RBS (E.D. Pa. Dec. 12, 2016) (ECF No. 1); Information ¶ 6, United States v. Malek, No. 2:16-cr-00508-RBS (E.D. Pa. Dec. 13, 2016) (ECF No. 1).

[7] See Tr. of Plea Hearing, *United States v. Glazer*, No. 2:16-cr-00506-RBS (E.D. Pa. Jan. 9, 2017) (ECF No. 24); *see also* Tr. of Plea Hearing, *United States v. Malek*, No. 2:16-cr-00508-RBS (E.D. Pa. Jan. 9, 2017) (ECF No. 24).

[8] DOJ Press Release (Dec. 14, 2016) *available at* https://www.justice.gov/opa/pr/former-top-generic-pharmaceutical-executives-charged-price-fixing-bid-rigging-and-customer

[9] *See, e.g.,* Eric Kroh, "Generic Drug Price-Fixing Suits Just Tip Of The Iceberg," Law360 (Jan. 6, 2017) ("'Once somebody starts cooperating, it leads to many more indictments.'"), *available at* https://www.law360.com/articles/877707/generic-drug-price-fixing-suits-just-tip-of-the-iceberg

15.    Although initial public disclosures suggested that the federal and state investigations were focused on one or two drugs, it is now clear that both investigations are much, much broader.  The investigations reportedly cover two dozen drugs and more than a dozen manufacturers.[10]  Press reports indicate that "[t]he Department of Justice (DoJ) believes price-fixing between makers of generic pharmaceuticals is widespread."[11]

16.    According to one report, prosecutors see the investigation of the generic drug industry much like DOJ's antitrust probe of the auto parts industry, which has morphed into DOJ's largest criminal antitrust probe ever.  *See In re Automotive Parts Antitrust Litig*., No. 2:12-md-02311 (E.D. Mich.).  As in that case, prosecutors expect "to move from one drug to another in a similar cascading fashion."[12]

17.    DOJ and a federal grand jury empaneled in the Eastern District of Pennsylvania have focused on at least sixteen generic drug manufacturers as part of the growing investigation, including:  Actavis Holdco U.S., Inc. ("Actavis"); Aurobindo Pharma USA, Inc. ("Aurobindo"); Citron Pharma LLC ("Citron"); Dr. Reddy's Laboratories, Inc. ("Dr. Reddy's"); Heritage Pharmaceuticals, Inc. ("Heritage"); Impax Laboratories, Inc. ("Impax"); Lannett Company, Inc. ("Lannett"); Mayne Pharma, Inc. ("Mayne"); Mylan Inc. ("Mylan"); Par Pharmaceuticals, Inc. ("Par"); Perrigo New York, Inc. ("Perrigo"); Sandoz, Inc. ("Sandoz"); Sun Pharmaceutical

---

[10] David McLaughlin & Caroline Chen, "U.S. Charges in Generic-Drug Probe to Be Filed by Year-End," Bloomberg (Nov. 3, 2016) *available at* http://www.bloomberg.com/news/articles/2016-11-03/u-s-charges-in-generic-drug-probe-said-to-be-filed-by-year-end

[11] PaRR Report, "DoJ Believes Collusion over Generic Drug Prices Widespread" (June 26, 2015) ("PaRR Report"), *available at* http://www.mergermarket.com/pdf/DoJ-Collusion-Generic-Drug-Prices-2015.pdf

[12] *Id.*

Industries, Inc. ("Sun"); Taro Pharmaceuticals USA, Inc. ("Taro"); Teva Pharmaceuticals USA, Inc. ("Teva"); and Zydus Pharmaceuticals USA, Inc. ("Zydus").

18.    The fact that these companies and/or their employees received subpoenas from a federal grand jury is significant.  DOJ does not empanel grand juries lightly.  The *Antitrust Division Manual* admonishes that "staff should consider carefully the likelihood that, if a grand jury investigation developed evidence confirming the alleged anticompetitive conduct, the Division would proceed with a criminal prosecution."  Accordingly, before a grand jury investigation proceeds, it requires a series of approvals, first by the relevant field chief, who then sends the request to the Antitrust Criminal Enforcement Division.  "The DAAG [Deputy Assistant Attorney General] for Operations, the Criminal DAAG, and the Director of Criminal Enforcement will make a recommendation to the Assistant Attorney General[,]" who must give final approval and authorize all attorneys who will participate in the investigation.[13]

19.    As Mark Rosman, former assistant chief of the National Criminal Enforcement Section of DOJ's Antitrust Division, noted in an article on the "unusual" nature of the criminal subpoenas, "A DOJ investigation into the alleged exchange of pricing information in the pharmaceutical industry likely indicates that the agency anticipates uncovering criminal antitrust conduct in the form of price-fixing or customer allocation."[14]

20.    Another significant indication of criminal price-fixing in the generic drug industry is that DOJ has received assistance from a privately-held company that came forward as a leniency applicant:  "It is understood that Heritage is cooperating with prosecutors in exchange for amnesty

---

[13] DOJ, Antitrust Division Manual (5th ed. 2015) at Chapter III-81 to 83, *available at* http://www.justice.gov/atr/public/divisionmanual/chapter3.pdf

[14] Mark Rosman & Seth Silber, "DOJ's Investigation Into Generic Pharma Pricing Is Unusual," Law360 (Nov. 12, 2014), *available at* https://www.wsgr.com/publications/PDFSearch/rosman-1114.pdf

from criminal prosecution under DOJ's leniency program[.]"[15]  As explained on DOJ's website, an applicant for amnesty "must admit its participation in a criminal antitrust violation involving price fixing, bid rigging, capacity restriction, or allocation of markets, customers, or sales or production volumes, before it will receive a conditional leniency letter."  The applicant must also establish that "[t]he confession of wrongdoing is truly a corporate act, as opposed to isolated confessions of individual executives or officials."[16]

21.    In addition to the federal criminal investigation, the Connecticut AG began an investigation in July 2014 into the dramatic price increases in generic drugs.  Now joined by the Attorneys General of 43 other states and the District of Columbia, the Connecticut AG has filed a civil complaint in the U.S. District Court for the District of Connecticut alleging price-fixing and customer allocation.  Although the States' present complaint focuses on two drugs (doxycycline hyclate delayed release and glyburide), the States make clear that they have "uncovered wide-ranging conduct implicating numerous different drugs and competitors" and suggest that additional drugs and manufacturers will be added "at the appropriate time."[17]

22.    The publicly available version of the State AG Complaint is heavily redacted.  Among the obscured portions are the contents of conspiratorial communications, which the Connecticut AG has described as "mind-boggling."[18]  The State AG Complaint explains that the generic drug industry is structured in a way that facilitates these types of collusive

---

[15] Richard Vanderford, "Generic Pharma Investigation Still Broad, Prosecutor Says," mLex (Feb. 21, 2017).

[16] DOJ, *Frequently Asked Questions about the Antitrust Division's Leniency Program* (updated Jan. 26, 2017), *available at* https://www.justice.gov/atr/page/file/926521/download

[17] *State of Connecticut v. Aurobindo Pharma USA, Inc.*, No. 3:16-cv-2056 (VLB) (D. Conn.) (Doc. 168 at ¶ 9) (State AG Amended Complaint).

[18] Mark Pazniokus, "How a small-state AG's office plays in the big leagues," CT Mirror (Jan. 27, 2017), *available at* http://ctmirror.org/2017/01/27/how-a-small-state-ags-office-plays-in-the-big-leagues/

communications. "Generic drug manufacturers operate, through their respective senior leadership and marketing and sales executives, in a manner that fosters and promotes routine and direct interaction among their competitors." This affords them opportunities to "exploit their interactions at various and frequent industry trade shows, customer conferences and other similar events, to develop relationships and sow the seeds for their illegal agreements."[19]

23.     The indictments and guilty pleas relating to Glazer and Malek, the grand jury subpoenas, and evidence divulged in the State AG Complaint are merely the tip of the iceberg. The government investigations have uncovered the existence of "a broad, well-coordinated and long-running series of schemes to fix the prices and allocate markets for a number of generic pharmaceuticals in the United States."[20] Plaintiffs do not yet have access to all of the information available to the government enforcement agencies. What is known is that Defendants, in concert, raised Clomipramine prices over 1000%. The large and unprecedented price increases for generic Clomipramine cannot be explained by normal, competitive market forces. The explanation is collusion.

### III.     THE ROLE OF INDEPENDENT PHARMACIES

24.     There are approximately 22,000 privately-owned independent pharmacies in the United States, as contrasted with chain drug stores such as CVS, Walgreens, and Rite Aid, and mass merchandiser or supermarket drug stores such as Wal-Mart, Target and Kroger. Over a billion prescriptions for U.S. patients are dispensed through independent pharmacies each year.

25.     The overcharges resulting from Defendants' conduct are directly traceable through the pharmaceutical distribution chain to independent pharmacies. Independent pharmacies rarely

---

[19] State AG Amended Complaint ¶ 7.
[20] State AG Amended Complaint ¶ 1.

purchase generic drugs directly from the manufacturer, and instead acquire drugs almost exclusively from drug wholesalers such as McKesson Corp., Cardinal Health Inc., or Amerisource Bergen Corp. As one would expect, the wholesaler's price includes a percentage markup over the manufacturer's price. Independent pharmacies, lacking the sales volume heft and wholesaler relationships enjoyed by their much larger competitors, have no meaningful ability to negotiate these acquisition costs. They must pay the price the wholesaler charges. As a result, when drug manufacturers collude to allocate customers or raise the prices of generic drugs, independent pharmacies end up paying illegally inflated prices for those drugs.

### IV.    JURISDICTION AND VENUE

26.    Plaintiffs bring Count One of this action under Section 16 of the Clayton Act (15 U.S.C. § 26) for injunctive relief and costs of suit, including reasonable attorneys' fees, against Defendants for the injuries sustained by Plaintiffs and the members of the Classes described herein by reason of the violations of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

27.    This action is also instituted under the antitrust, consumer protection, and common laws of various states and territories for damages and equitable relief, as described in Counts Two through Four below.

28.    Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1337 and by Section 16 of the Clayton Act (15 U.S.C. § 26).  In addition, jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1332(d) and 1367, and 28 U.S.C. §§ 1446(a).

29.    Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a) and 22 and 28 U.S.C §§ 1391(b), (c) and (d); and 1407 and MDL Order dated April 6, 2017 (ECF No. 291), and because, during the Class Period, Defendants resided, transacted business, were found, or had agents in this District, and a substantial portion of the affected interstate trade and commerce described below has been carried out in this District.  Venue is also proper in this District because the federal grand

jury investigating the pricing of generic drugs is empaneled here and therefore it is likely that acts in furtherance of the alleged conspiracy took place here. According to DOJ guidelines, an "investigation should be conducted by a grand jury in a judicial district where venue lies for the offense, such as a district from or to which price-fixed sales were made or where conspiratorial communications occurred."[21]

30.    This Court has personal jurisdiction over each Defendant because, *inter alia*, each Defendant:  (a) transacted business throughout the United States, including in this District; (b) sold Clomipramine throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; (d) was engaged in an illegal scheme and nationwide price-fixing conspiracy that was directed at, had the intended effect of causing injury to, and did cause injury to persons residing in, located in, or doing business throughout the United States, including in this District; and/or (e) took overt action in furtherance of the conspiracy in this District or conspired with someone who did, and by doing so could reasonably have expected to be sued in this District. In addition, nationwide personal jurisdiction was authorized by Congress pursuant to the Clayton Act and by 28 U.S.C. § 1407.

## V.    PARTIES

### A.    Plaintiffs

31.    Plaintiff West Val Pharmacy ("West Val") is a privately held independent pharmacy that has been in business since 1959 and is currently located at 5353 Balboa Boulevard in Encino, California. West Val Pharmacy indirectly purchased and continues to purchase Defendants' generic Clomipramine products at supracompetitive prices during the Class Period, and was thereby injured and suffered damages as a result of Defendants' unlawful conduct.

---

[21] DOJ, Antitrust Division Manual at III-83.

32.     Plaintiff Halliday's & Koivisto's Pharmacy ("Halliday's") is an independent pharmacy located at 4133 University Boulevard in Jacksonville, Florida. Halliday's has served the Jacksonville community for over 50 years. Halliday's indirectly purchased and continues to purchase Defendants' generic Clomipramine products at supracompetitive prices during the Class Period, and was thereby injured and suffered damages as a result of Defendants' unlawful conduct.

33.     Plaintiff Falconer Pharmacy, Inc. ("Falconer") is a privately held independent pharmacy located in Falconer, New York. Falconer Pharmacy indirectly purchased and continues to purchase Defendants' generic Clomipramine products at supracompetitive prices during the Class Period, and was thereby injured and suffered damages as a result of Defendants' unlawful conduct.

34.     Plaintiff Deal Drug Pharmacy ("Deal Drug") is a privately held independent pharmacy in Nashville, Tennessee. Deal Drug indirectly purchased and continues to purchase Defendants' generic Clomipramine products at supracompetitive prices during the Class Period, and was thereby injured and suffered damages as a result of Defendants' unlawful conduct.

35.     Plaintiff Chet Johnson Drug, Inc. ("Chet Johnson") is a privately held independent pharmacy in Avery, Wisconsin. Chet Johnson indirectly purchased and continues to purchase Defendants' generic Clomipramine products at supracompetitive prices during the Class Period, and was thereby injured and suffered damages as a result of Defendants' unlawful conduct.

**B.     Defendants**

36.     Defendant Mylan Inc. is a Pennsylvania corporation with its principal place of business in Canonsburg, Pennsylvania.

37.     Defendant Mylan Pharmaceuticals Inc. is a West Virginia corporation with its principal place of business in Morgantown, West Virginia. Mylan Inc. and Mylan Pharmaceuticals Inc. are wholly-owned subsidiaries of Mylan N.V., a Dutch pharmaceutical company.  In this

Complaint, Defendants Mylan Inc. and Mylan Pharmaceuticals Inc. are together referred to as "Mylan." During the Class Period, Mylan sold Clomipramine to purchasers in this District and throughout the United States.

38.     Defendant Sandoz, a Colorado corporation with its principal place of business in Princeton, New Jersey. During the Class Period, Sandoz sold Clomipramine to purchasers in this District and throughout the United States.

39.     Defendant Taro is a New York corporation with its principal place of business in Hawthorne, New York. Taro USA is a wholly-owned subsidiary of Taro Pharmaceutical Industries, Ltd. During the Class Period, Taro sold Clomipramine to purchasers in this District and throughout the United States.

**C.      Co-conspirators**

40.     Various other persons, firms, corporations and entities have participated as co-conspirators with Defendants in the violations and conspiracy alleged herein. In order to engage in the violations alleged herein, these co-conspirators have performed acts and made statements in furtherance of the antitrust violations and conspiracies alleged herein. Plaintiffs may amend this Complaint to allege the names of additional co-conspirators as they are discovered.

## VI.      INTERSTATE COMMERCE

41.     During the Class Period, Defendants sold and distributed generic Clomipramine in a continuous and uninterrupted flow of interstate commerce to customers throughout the United States, including in this District.

42.     Defendants' and their co-conspirators' conduct, including the marketing and sale of generic Clomipramine, took place within, has had, and was intended to have, a direct, substantial, and reasonably foreseeable anticompetitive effect upon interstate commerce within the United States.

43.     Defendants' anticompetitive conduct occurred in part in trade and commerce within the states and territories set forth herein, and also had substantial intrastate effects in that, *inter alia*, drug wholesalers within each state and territory were foreclosed from offering less expensive generic Clomipramine to Plaintiffs inside each respective state and territory.  The foreclosure of these less expensive generic products directly impacted and disrupted commerce for Plaintiffs within each state and territory and forced Plaintiffs to pay supracompetitive prices.

## VII.     BACKGROUND ON THE GENERIC DRUG INDUSTRY

### A.     Generic drugs are commodity products that compete on price

44.     Approximately 88% of all pharmaceutical prescriptions in the United States are filled with a generic drug.[22]   In 2015, generic drug sales in the United States were estimated at $74.5 billion.[23]

45.     According to the U.S. Food & Drug Administration ("FDA"), a generic drug is "the same as a brand name drug in dosage, safety, strength, how it is taken, quality, performance, and intended use."[24]  Once the FDA approves a generic drug as "therapeutically equivalent" to a brand drug, the generic version "can be expected to have equal effect and no difference when substituted for the brand name product."[25]

46.     In a competitive market, generic drugs cost substantially less than branded drugs. The U.S. Congressional Budget Office ("CBO") estimates that, "[o]n average, the retail price of a

---

[22] GPhA, *Generic Drug Savings in the U.S.* (2015) ("GPhA Report") at 1, *available at* http://www.gphaonline.org/media/wysiwyg/PDF/GPhA_Savings_Report_2015.pdf

[23] Connecticut AG, Press Release (Dec. 15, 2016), *available at* http://www.ct.gov/ag/cwp/view.asp?Q=588538&A=2341

[24] FDA Website, *available at* http://www.fda.gov/Drugs/InformationOnDrugs/ucm079436.htm#G

[25] *Id.*

generic drug is 75 percent lower than the retail price of a brand-name drug."[26] And that may be conservative. According to a Federal Trade Commission ("FTC") study, in a "mature generic market, generic prices are, on average, 85% lower than the pre-entry branded drug price."[27] Mature generic markets—like that of Clomipramine—typically have several manufacturers that compete for sales, hence keeping prices in check.

47.     Generic drug price competition provides enormous savings to consumers, pharmacies, and other drug purchasers, as well as to private health insurers, health and welfare funds, and state Medicaid programs. Indeed, one study found that the use of generic medicines saved the United States healthcare system $254 billion in 2014 alone, and $1.68 trillion between 2005 and 2014.[28]

48.     The significant cost savings provided by generic drugs motivated Congress to enact the Drug Price Competition and Patent Term Restoration Act of 1984, more commonly known as the "Hatch-Waxman Act" (Pub. L. No. 98-417, 98 Stat. 1585). The Act streamlines the regulatory hurdles that generic drug manufacturers have to clear prior to marketing and selling generic drugs. Generic drug manufacturers may obtain FDA approval in an expedited fashion through the filing of an Abbreviated New Drug Application ("ANDA") that establishes that its product is bioequivalent to the branded counterpart.

49.     Since passage of the Hatch-Waxman Act, every state has adopted substitution laws requiring or permitting pharmacies to substitute generic drug equivalents for branded drug

---

[26] CBO, *Effects of Using Generic Drugs on Medicare's Prescription Drug Spending* (Sep. 15, 2010), *available at* https://www.cbo.gov/publication/21800
[27] FTC, *Pay-For-Delay: How Drug Company Pay-offs Cost Consumers Billions* (Jan. 2010), *available at* http://www.ftc.gov/os/2010/01/100112payfordelayrpt.pdf
[28] GPhA Report at 1.

prescriptions (unless the prescribing physician specifically orders otherwise by writing "dispense as written" or similar language on the prescription).

50.    Because each generic is readily substitutable for another generic of the same brand drug, pricing is the main differentiating feature.  As recognized by the FTC, "generic drugs are commodity products" and, as a consequence of that, are marketed "primarily on the basis of price."[29]  In a competitive market, generic manufacturers cannot significantly increase prices (or maintain high prices in the face of a competitor's lower price) without losing a significant volume of sales.

51.    It is well-established that competition among generic manufacturers drives down price.  Before generic drugs enter a market, the brand drug has a monopoly and captures 100% of sales.  When lower-priced generics become available, the brand drug quickly loses market share as purchasers switch to the cheaper alternatives.  Over time, the price of a generic drug approaches the manufacturers' marginal costs.  As illustrated in the following chart, the price of a generic drug tends to decrease as more generic drug manufacturers enter the market:

---

[29] FTC, *Authorized Generic Drugs: Short-Term Effects and Long-Term Impact* (Aug. 2011), *available at* http://www.ftc.gov/os/2011/08/2011genericdrugreport.pdf



**Generic Competition and Drug Prices**

Source: FDA analysis of retail sales data from IMS Health, IMS National Sales Perspective (TM), 1999-2004, extracted February 2005

52.    When new entrants join a competitive generic market, they typically will price their product below the prevailing market price in order to gain market share. A recent government report confirmed this phenomenon in interviews with generic manufacturers: "manufacturers said that if a company is bringing a generic drug into an established drug market, it typically offers a price that is lower than the current market price in order to build its customer base. Manufacturers also said that as each new manufacturer enters an established generic drug market the price of that generic will fall, with one manufacturer noting that it is typically a 20 percent price decline per entrant."[30]

53.    When there are multiple generic manufacturers in an established generic market—as with generic Clomipramine—prices should remain low and stable, and should not increase absent a market disruption or, as is the case here, anticompetitive conduct.

**B.    Pricing of generic drugs discourages unilateral price increases**

54.    In simple terms, the generic pharmaceutical supply chain flows as follows: Manufacturers sell drugs to wholesalers. Wholesalers sell drugs to pharmacies. Pharmacies

---

[30] GAO Report at 23.

dispense the drugs to consumers, who pay the full retail price if they are uninsured, or a portion of the retail price (e.g., a co-pay or co-insurance) if they are insured. The insured consumers' health plans then pay the pharmacies additional amounts that are specified in agreements between them and the pharmacies. These agreements are sometimes arranged by middlemen known as Pharmacy Benefit Managers ("PBMs").

55.     Because the prices paid by purchasers of generic drugs differ at each level of the market and most of the transactions occur between private parties according to terms that are not publicly disclosed, the price of a given drug is not always obvious. Marketwide pricing for a given drug, however, may be observed through the Centers for Medicare & Medicaid Services ("CMS") survey of National Average Drug Acquisition Cost ("NADAC"). NADAC was "designed to create a national benchmark that is reflective of the prices paid by retail community pharmacies to acquire prescription . . . drugs."[31]  "NADAC is a simple average of the drug acquisition costs submitted by retail pharmacies," in effect "a single national average."[32]  Thus, NADAC is one way to track general price trends in the marketplace.

56.     While NADAC provides the average price level across all manufacturers of a given drug, other price measures are manufacturer-specific. Drug manufacturers typically report benchmarks—like Wholesale Acquisition Cost ("WAC")—for their drugs, which are then published in compendia used by participants in the pharmaceutical industry. The benchmarks are not actual transaction prices; rather, they are the manufacturer's reported list price, which is sometimes subject to discounts. In order track manufacturer-specific pricing, this Complaint uses

---

[31] CMS, Methodology for Calculating the National Average Drug Acquisition Cost (NADAC) for Medicaid Covered Outpatient Drugs at 5, *available at* https://www.medicaid.gov/medicaid-chip-program-information/by-topics/prescription-drugs/ful-nadac-downloads/nadacmethodology.pdf.
[32] *Id.*

QuintilesIMS's National Sales Perspectives ("NSP") data, which "captures 100% of the total U.S. pharmaceutical market, measuring sales at actual transaction prices rather than using an average wholesale price" and includes sales by manufacturers into various outlets.[33]

57.     When third-party payers (e.g., health plans) pay pharmacies to dispense drugs to their covered patients, the amount is typically determined with reference to a benchmark or list price like a WAC.  Some third-party payers and PBMs have implemented their own individual caps—Maximum Allowable Cost ("MAC")—that set the maximum amounts they will pay pharmacies for some generic drugs, regardless of the pharmacies' acquisition costs. A pharmacy must often dispense the drug at a loss if it cannot find a wholesaler offering the drug at a price or below the MAC cap.

58.     Although MAC caps do not apply directly to manufacturers, these caps impose a restraint on manufacturers' prices. The MAC cap essentially limits the pharmacies' discretion to adjust retail prices upwards, so pharmacies are incentivized to buy from the cheapest wholesaler and wholesalers to buy from the cheapest manufacturer. This additional pressure on prices means a generic manufacturer that increases its price for a drug should expect to lose sales to a competitor with a lower price.  Consequently, in the absence of coordinated pricing activity among generic manufacturers, an individual manufacturer should not be able to significantly increase its price (or maintain a higher price in the face of a significantly lower competitor price) without incurring the loss of a significant volume of sales.  In a market with MAC caps, it is unlikely that a generic drug manufacturer would risk raising its price unless it has been agreed with competitors that they will raise their prices, too.

---

[33]  IMS Institute for Healthcare Informatics, HSRN Data Brief: National Sales Perspectives at 1, *available at* https://www.imshealth.com/files/web/IMSH%20Institute/NSP_Data_Brief-.pdf.

## VIII.    THE GENERIC CLOMIPRAMINE CONSPIRACY

### A.    Congressional responses to generic Clomipramine price increases

59.    In addition to the investigations by DOJ and the Connecticut AG, Congress has raised concerns about the alarming price spikes for numerous generic pharmaceuticals.  These concerns were prompted by the very real hardship suffered by independent pharmacies as a result of the unprecedented price increases.

60.    In the Fall of 2014, Senator Bernie Sanders and Representative Elijah Cummings requested information from manufacturers of 10 drugs that had experienced extraordinary price increases.  Six of those drugs are now the subject of complaints in this MDL.[34]  Defendant Mylan is one of the manufacturers that Sanders and Cummings singled out.  In November 2014, Senator Sanders conducted a hearing entitled, "Why Are Some Generic Drugs Skyrocketing in Price?" ("Senate Hearing").  Various witnesses discussed the price hikes for generic drugs, but none of the industry executives who were invited to testify appeared.[35]

61.    Senator Sanders and Representative Cummings followed up with a request to the Office of the Inspector General of the Department of Health & Human Services ("OIG"), asking it to investigate the effect that price increases of generic drugs have had on the Medicare and Medicaid programs.  The OIG issued its report in December 2015, confirming that price increases for numerous generic drugs far out-stripped inflation.[36]

---

[34] Senator Sanders, Press Release, "Congress Investigating Why Generic Drug Prices Are Skyrocketing" (Oct. 2, 2014), *available at* https://www.sanders.senate.gov/newsroom/press-releases/congress-investigating-why-generic-drug-prices-are-skyrocketing

[35] Senate Hearing (Nov. 20, 2014), *available at* https://www.help.senate.gov/hearings/why-are-some-generic-drugs-skyrocketing-in-priced

[36] HHS OIG, *Average Manufacturer Prices Increased Faster than Inflation for Many Generic Drugs* (Dec. 2015), *available at* https://oig.hhs.gov/oas/reports/region6/61500030.pdf

62.    In response to another Congressional request—this one from Senators Susan Collins, Claire McCaskill, Bill Nelson and Mark Warner—the United States Government Accountability Office ("GAO") issued a report in August 2016 entitled "Generic Drugs Under Medicare: Part D Generic Drug Prices Declined Overall, but Some Had Extraordinary Price Increases."[37]  The GAO investigation confirmed that in a competitive market, generic drug prices decline and remain stable, absent shortages or other market disruptions.[38]  And this was the case for most generics.  But it identified numerous drugs that experienced "extraordinary" increases, which it defined as an increase of more than 100%.[39]  The investigation further revealed that price increases for Clomipramine were some of the most dramatic in the industry, "increas[ing] over 2,000 percent in 1 year, going from $0.34 per capsule in the first quarter of 2013 to $8.43 per capsule in the first quarter of 2014."[40]

**B.    The generic Clomipramine market**

63.    Clomipramine is sold throughout the United States and its territories.  The market for generic Clomipramine is mature and Defendants that operate in that market can only gain market share by competing on price.

64.    The Swiss drug manufacturer Ciba-Geigy discovered Clomipramine in 1964, and generic versions of the medication became available in the United States in 1996.  The FDA initially approved branded Clomipramine for use in the United States in 1989 and Mallinckrodt Pharmaceuticals sold the medication under the brand name Anafranil.  Since 1996, several generic

---

[37] GAO Report.

[38] *Id.* at 23-25.

[39] *Id.* at 1 & Appendix III.

[40] *Id.* at 14 & Appendix III.

manufacturers have obtained abbreviated approval from the FDA to sell generic bioequivalents to Anafranil with the same active ingredient, Clomipramine.

65.     At all relevant times, Defendants had substantial market power with respect to generic Clomipramine.  Defendants exercised this power to maintain supracompetitive prices for Clomipramine without losing so many sales as to make the elevated price unprofitable.

66.     Defendants sold generic Clomipramine at prices in excess of marginal costs, in excess of a competitive price, and enjoyed high profit margins.  For example, in 2013, Mylan's sales of Clomipramine totaled [redacted].

67.     During the Class Period, Defendants dominated the Clomipramine market. Defendants controlled [redacted]

68.     Through their market dominance, Defendants have successfully foreclosed the market to rival competition, thereby maintaining and enhancing market power and enabling Defendants to charge Plaintiffs supracompetitive prices for generic Clomipramine.

**C.     Defendants conspired to increase the price of Clomipramine**

69.     Beginning in approximately May 2013 and continuing to the present, Defendants formed and maintained a price-fixing cartel that included all of their generic Clomipramine products.  Senior executives of each Defendant reached agreement and monitored compliance. These executives included Mylan's CEO Heather Bresch.  On information and belief, these executives also included Sandoz's Peter Goldschmidt, Taro Ltd.'s interim CEO from September 2010 to August 2013, James Kedrowski, and CEO from August 2013 to December 2016, Kal Sundaram, and Taro Inc.'s President from 2012 to 2015, James Kedrowski.

70.     As the following graphs indicate, prices for generic Clomipramine increased significantly.  These graphs are based on National Average Drug Acquisition Cost ("NADAC") data provided to the public by the Centers for Medicare and Medicaid Services ("CMS").

21

According to CMS, NADAC data is based on a regularly-updated survey that "collects acquisition costs for covered outpatient drugs purchased by retail community pharmacies, which include invoice purchase prices from independent and chain retail community pharmacies." Pharmacies included in the survey are from all fifty states and the District of Columbia. CMS has explained that "NADAC is designed to create a national benchmark that is reflective of the prices paid by retail community pharmacies to acquire prescription and over-the-counter covered outpatient drugs."[41]

71. The graphs depict the sharp increase in NADAC for the 25, 50, and 75 milligram pills of Clomipramine:



_____

[41] Centers for Medicare & Medicaid Services, Methodology for Calculating the National Average Drug Acquisition Cost (NADAC) for Medicaid Covered Outpatient Drugs (Nov. 2013), *available at* https://www.medicaid.gov/medicaid-chip-program-information/by-topics/prescription-drugs/ful-nadac-downloads/nadacmethodology.pdf.



Source: NADAC Price Data



Source: NADAC Price Data

72.     Before the Class Period, the effective prices of Defendants' Clomipramine remained stable for years, as is typical in a mature market.  As illustrated below, Defendants' effective prices inexplicably increased sharply beginning in May 2013:

[chart redacted]
[chart redacted]

[chart redacted]

73.    **Mylan**: For over two years before the Class Period began, the average effective price per unit of its products was: [redacted]

74.    By April 2013 Mylan's effective prices had gradually doubled.  But in May and June of 2013, it began a drastic increase of its effective prices:

| Clomipramine Product | Price April 2013 | Hike Date | Hike Price | Percentage Increase |
|---|---|---|---|---|
| CAP 25 MG | [redacted] | [redacted] | [redacted] | [redacted] |
| CAP 50 MG | [redacted] | [redacted] | [redacted] | [redacted] |
| CAP 75 MG | [redacted] | [redacted] | [redacted] | [redacted] |

75.    Mylan's effective prices would continue to climb, peaking over the next year and increasing as much as [redacted] above its pre-conspiracy price levels:

| Clomipramine Product | Price Date | Peak Price | Percentage Increase |
|---|---|---|---|
| CAP 25 MG | [redacted] | [redacted] | [redacted] |

| Clomipramine Product | Price Date | Peak Price | Percentage Increase |
|---|---|---|---|
| CAP 50 MG | [redacted] | [redacted] | [redacted] |
| CAP 75 MG | [redacted] | [redacted] | [redacted] |

76.     Even today, Mylan's effective prices remain unexpectedly high and would not have remained so high but for the price fixing conspiracy.  For example, in February 2017, its prices were as much as [redacted] higher than in April 2013:

| Clomipramine Product | Price April 2013 | Price Feb. 2017 | Percentage Increase |
|---|---|---|---|
| CAP 25 MG | [redacted] | [redacted] | [redacted] |
| CAP 50 MG | [redacted] | [redacted] | [redacted] |
| CAP 75 MG | [redacted] | [redacted] | [redacted] |

77.     **Taro**: For over two years before the Class Period began, the average effective price per unit of its products was: [redacted].

78.     In April 2013 Taro's effective prices were only slightly higher.  But in May 2013, it began a drastic increase of its effective prices:

| Clomipramine Product | Price April 2013 | Hike Date | Hike Price | Percentage Increase |
|---|---|---|---|---|
| CAP 25 MG | [redacted] | [redacted] | [redacted] | [redacted] |
| CAP 50 MG | [redacted] | [redacted] | [redacted] | [redacted] |
| CAP 75 MG | [redacted] | [redacted] | [redacted] | [redacted] |

79.     Taro's effective prices would continue to climb, peaking over the next year and increasing as much as [redacted] above its pre-conspiracy price levels:

| Clomipramine Product | Price Date | Peak Price | Percentage Increase |
|---|---|---|---|
| CAP 25 MG | [redacted] | [redacted] | [redacted] |
| CAP 50 MG | [redacted] | [redacted] | [redacted] |
| CAP 75 MG | [redacted] | [redacted] | [redacted] |

80.    Even today, Taro's effective prices remain unexpectedly high and would not have remained so high but for the price fixing conspiracy.  For example, in February 2017, its prices were as much as [redacted] higher than in April 2013:

| Clomipramine Product | Price April 2013 | Price Feb. 2017 | Percentage Increase |
|---|---|---|---|
| CAP 25 MG | [redacted] | [redacted] | [redacted] |
| CAP 50 MG | [redacted] | [redacted] | [redacted] |
| CAP 75 MG | [redacted] | [redacted] | [redacted] |

81.    **Sandoz**: For over two years before the Class Period began, the average effective price per unit of its products was [redacted].

82.    [redacted] But in May 2013, it began a drastic increase of its effective prices:

| Clomipramine Product | Price April 2013 | Hike Date | Hike Price | Percentage Increase |
|---|---|---|---|---|
| CAP 25 MG | [redacted] | [redacted] | [redacted] | [redacted] |
| CAP 50 MG | [redacted] | [redacted] | [redacted] | [redacted] |

83.    Sandoz's effective prices would continue to climb, peaking in 2014 and 2016 and increasing as much as [redacted] above its pre-conspiracy price levels:

| Clomipramine Product | Price Date | Peak Price | Percentage Increase |
|---|---|---|---|
| CAP 25 MG | [redacted] | [redacted] | [redacted] |
| CAP 50 MG | [redacted] | [redacted] | [redacted] |
| CAP 75 MG | [redacted] | [redacted] | [redacted] |

84.     Even today, Sandoz's effective prices remain unexpectedly high and would not have remained so high but for the price fixing conspiracy.  For example, in February 2017, its prices were as much as [redacted] higher than in April 2013:

| Clomipramine Product | Price April 2013 | Price Feb. 2017 | Percentage Increase |
|---|---|---|---|
| CAP 25 MG | [redacted] | [redacted] | [redacted] |
| CAP 50 MG | [redacted] | [redacted] | [redacted] |

85.     There are no competitive explanations for these price hikes.  There were no supply shortages or disruptions, new patents or formulations, or changes in drug labeling that could explain the abrupt, dramatic, and uniform price hikes. For example, there are no Clomipramine shortages reported during the relevant period in either the FDA's database on drug shortages or in lists of drug shortages maintained by the American Society of Health-System Pharmacists ("ASHP").    To the contrary, anticompetitive activity explains these skyrocketing prices. Pharmaceutical analyst Richard Evans at Sector & Sovereign Research explained potential causes of generic drug price hikes in a 2015 report:   "A plausible explanation is that generic manufacturers, having fallen to near historic low levels of financial performance are cooperating to raise the prices of products whose characteristics—low sales due to either very low prices or very low volumes—accommodate price inflation."

86.    The overcharges resulting from Defendants' conduct are directly traceable through the pharmaceutical distribution chain to independent pharmacies.  A manufacturer first sells the drug to direct purchaser wholesalers based on the listed WAC, minus applicable discounts. Wholesalers then sell the drug to pharmacies, which in turn sell the drugs to independent pharmacies.  The WAC serves as the benchmark for prices throughout the distribution chain.

87.    Defendants' price increases for Clomipramine resulted in corresponding increases to the prices paid by Plaintiffs and members of the proposed Classes.  Corresponding increases in Clomipramine's transactional prices demonstrate that increased WAC prices translate to increases in the prices paid by independent pharmacies.

88.    Defendants' sudden and massive price increases represented a sharp departure from the previous years of low and stable prices.

89.    These dramatic price increases were the product of an illicit understanding among Defendants.  Public statements by Defendants' CEOs reflect their agreement to increase Clomipramine prices, and served as means of communicating the objectives of the conspiracy to other Defendants.

90.    For instance, Mylan's CEO, Ms. Bresch, frequently made public statements about the need not to compete on price.[42]  To Ms. Bresch, "rational" behavior was increasing or maintaining prices, while "irrational" behavior was competing on price.

91.    Defendants were aware of, and in fact praised, the lack of generic drug competition. For example, Kal Sundaram, then-CEO of Taro Inc. said in a November 10, 2014 earnings call, "Taro's sales and earnings growth is attributable to upward price adjustments and the prudent life

---

[42] Mylan, Transcript of Q3 2012 Earnings Call (Oct. 25, 2012), *available at* https://seekingalpha.com/article/951051-mylan-management-discusses-q3-2012-results-earnings-call-transcript.

cycle management of our product portfolio while our overall volumes remain relatively constant. . . ."[43]

### D.    Defendants had many opportunities to conspire on Clomipramine

92.    In order to be successful, collusive agreements require a level of trust among the conspirators.  While this can be accomplished by one-on-one communications, collaboration is also fostered through industry associations, which facilitate relationships between individuals who should otherwise be predisposed to compete vigorously with each other.

93.    For example, Defendants are members of the same trade association:  the Association for Accessible Medicines ("AAM"), formerly known as the GPhA.  AAM/GPhA bills itself as "the nation's leading trade association for manufacturers and distributors of generic prescription drugs."  Its website promises that "[b]y becoming part of GPhA, you can participate in shaping the policies that govern the generic industry" and enjoy "valuable membership services, such as business networking opportunities, educational forums, access to lawmakers and regulators, and peer-to-peer connections."[44]

94.    Senior executives of Defendants participate actively in AAM.  For instance, Mylan's CEO, Ms. Bresch, is a current member and former chair of AAM's board of directors.  Peter Goldschmidt, Sandoz's U.S. President and Head of North America, is a member of AAM's board of directors.  And Stephen Manzano, Taro's Secretary, Group Vice President and General Counsel is also a member of AAM's board of directors.  Representatives of Defendants met in person at GPhA/AAM meetings before and during the Class Period, including on February 20 to

---

[43] Taro, Transcript of Q2 2014 Earnings Call (Nov. 10, 2014), *available at* https://seekingalpha.com/article/2665835-taro-pharmaceutical-industries-taro-ceo-kal-sundaram-on-q2-2014-results-earnings-call-transcript.

[44] http://www.gphaonline.org/about/membership.

22, 2013 in Orlando, Florida and June 4 to 5, 2013 in Bethesda, Maryland, dates that approximately correspond to the over 1,000% price hike of generic Clomipramine by all three generic manufacturers.

95.    Defendants used these in-person meetings to facilitate their conspiratorial communications and implement their anticompetitive scheme to raise maintain, and stabilize the prices of Clomipramine, as well as other drugs, and to allocate markets and customers for Clomipramine.

96.    In addition to GPhA, Defendants also belonged to or attended events sponsored by the National Association of Chain Drug Stores ("NACDS") ██████████████████████ ████████████████████  NACDS is a national trade association representing chain community pharmacies.  Its members include drug manufacturers, wholesalers, and retail chain pharmacies. Defendants Perrigo and Taro are members of NACDS.  NACDS holds regular industry events, including annual and regional conferences, which Defendants and other generic manufacturers attended. ███████████████████████████████████████████████ ██████████████████████████████████

97.    As the state attorneys' general investigation uncovered, Defendants' representatives and representatives from other generic drug manufacturers met at these various conferences and trade shows and discussed their respective businesses and customers.  These discussions occurred at related social events including lunches, cocktail parties, dinners, and golf outings.  Defendants' employees used these opportunities to discuss and share upcoming bids, specific generic drug markets, pricing strategies, and pricing terms in their contracts with customers.

98.     In addition to trade association meetings and events, Defendants and other generic manufacturers often participated in smaller group dinners and other private meetings.  A large number of generic drug manufacturers—including Defendants Mylan, Sandoz, and Taro—are headquartered in close proximity to one another in New York, New Jersey, eastern Pennsylvania, and West Virginia giving them easier and more frequent opportunities to meet and collude.

99.     As uncovered by the state attorneys' general investigation, high-level executives of many generic drug manufacturers get together periodically for "industry dinners."  For example, in January 2014, at a time when the prices of a number of generic drugs were reportedly soaring, at least thirteen high ranking male executives, including CEOs, Presidents, and Senior Vice Presidents of various generic drug manufacturers, met at a steakhouse in Bridgewater, New Jersey.

100.     Female generic pharmaceutical sales representatives also get together regularly for what they refer to as a "Girls' Night Out" ("GNO"), or alternatively "Women in the Industry" meetings and dinners.  During these GNOs, meetings and dinners, these representatives meet with their competitors and discuss competitively sensitive information.  Several different GNOs were held in 2015, including: ███████████████████████ (2) in Baltimore, Maryland in May; and (3) at the NACDS conference in August.

101.     Thus, Defendants had numerous opportunities to meet and conspire at trade association meetings, as well as at industry healthcare meetings.

**E.     Defendants' concerted efforts to increase prices for generic Clomipramine yielded supracompetitive profits**

102.     As demonstrated in the charts above, Defendants' agreement led to skyrocketing prices for Clomipramine, from far less than $1 per capsule to approximately $8.

103.    The enormous price hikes were not accompanied by a significant change in costs to manufacturers.   Thus, the increased prices resulted in an enormous increase in profits to Defendants.

**F.     The Clomipramine market is susceptible to collusion**

104.    Publicly available data on the generic Clomipramine market in the United States demonstrate that it is susceptible to cartelization by Defendants. Factors that make a market susceptible to collusion include:    (1) a high degree of industry concentration; (2) significant barriers to entry; (3) inelastic demand; (4) the lack of available substitutes for the goods involved; (5) a standardized product with a high degree of interchangeability between the products of cartel participants; and (6) inter-competitor contacts and communication.

**1.     Industry concentration**

105.    A high degree of concentration facilitates the operation of a cartel because it makes it easier to coordinate behavior among co-conspirators.   The market for generic Clomipramine was, and continues to be, extraordinarily concentrated.   The commonly accepted measure of market concentration is the Herfindahl-Hirschman Index ("HHI").   The HHI is calculated by squaring the market share of each firm competing in the market and then summing the resulting numbers.   For example, for a market consisting of three firms with shares of 20%, 30%, and 50%, the HHI is 3,800.   Federal antitrust enforcement agencies consider markets in which the HHI is above 2,500 to be highly concentrated.   In merger reviews, for instance, a proposed merger that would lead to a highly concentrated market, and an increase in the HHI of more than 200 points, creates a presumption of market power and a recognized risk of collusion.   Here, throughout the relevant period, the HHI for generic Clomipramine remained at or above approximately 4,000—a concentration level significantly beyond what antitrust enforcement agencies consider to be highly concentrated and vulnerable to collusion.

33

106.    While the market for Clomipramine is sufficiently concentrated to facilitate collusion, the years of low and stable pricing in the market establish that the number of manufacturers in the market was sufficient to drive competition.  Absent collusion, prices would have remained at competitive levels.

107.    No departures from the market by manufacturers of Clomipramine can explain the price increases.

108.    Defendants have been able to maintain supracompetitive prices for Clomipramine without significant loss of market share to non-conspirators.  Thus, Defendants have oligopolistic market power in the market for Clomipramine.

109.    The magnitude of Defendants' price increases for Clomipramine distinguishes them from non-collusive oligopolistic pricing.  Non-collusive oligopolistic pricing would be expected to proceed incrementally, as manufacturers test the waters to see if competitors will follow a price increase.  But here the increases are extreme, and such moves are not rational in the absence of advance knowledge that competitors will join the increase.

### 2.    Barriers to entry

110.    Supracompetitive pricing in a market normally attracts additional competitors who want to avail themselves of the high levels of profitability that are available.  However, the presence of significant barriers to entry makes this more difficult and helps to facilitate the operation of a cartel.

111.    There are significant capital, regulatory, and intellectual property barriers to entry in the generic Clomipramine markets that make such entry time-consuming and expensive.

112.    Start-up costs and regulatory oversight represent substantial barriers to entry in the generic Clomipramine markets.

113.    In addition to the significant out-of-pocket costs required to bring a drug to market, the approval process for generic drugs takes significant time.  As Kansas Senator Jerry Moran commented on September 21, 2016 during Congressional hearings on the FDA's role in the generic drug market, "there are more than 4,000 generic drug applications currently awaiting approval, and the median time it takes for the FDA to approve a generic is now 47 months or nearly four years."[45]  This significant delay for new market entrants effectively precludes new competition from eroding the supracompetitive prices imposed by the conspiracy.

### 3.    Inelasticity demand

114.    A product exhibits completely inelastic demand if buyers will continue to buy it regardless of the price. No product is completely inelastic, but prescription medicines come close.

115.    Demand for Defendants' Clomipramine products is inelastic largely because, while they are somewhat interchangeable with one another, they cannot be substituted for other products given their pharmacological characteristics.  Doctors who prescribe Clomipramine have the best therapy and not the cheapest cost in mind; patients cannot write themselves a prescription for a cheaper substitute or comfortably forgo treatment; and pharmacies have no choice but to fill the prescription as written.  When Defendants increased their Clomipramine prices, independent pharmacies could not simply purchase and dispense less-expensive alternative products.

116.    In order for a cartel to profit from raising prices above competitive levels, demand must be sufficiently inelastic such that any loss in sales will be more than offset by increases in revenue on those sales that are made.  Otherwise, increased prices would result in declining sales, as customers purchased substitute products or declined to buy altogether. Inelastic demand is a

---

[45] Senator Moran, Statement (Sep. 21, 2016), *available at*
http://www.appropriations.senate.gov/imo/media/doc/092116-Chairman-Moran-Opening-Statement.pdf

market characteristic that facilitates collusion, allowing producers to raise their prices without triggering customer substitution and lost sales revenue.

117.    Thus, generic Clomipramine is an excellent candidate for cartelization because price increases will result in more revenue, rather than less, provided that most or all manufacturers participate.

### 4.    Lack of substitutes

118.    Clomipramine has been available in brand-name and generic versions.  In 1996, the FDA approved the substitution of generic Clomipramine for brand-name Clomipramine. However, bioequivalence as between brand and generic Clomipramine is controversial, and some medical organizations recommend that patients be started and maintained on either brand or generic Clomipramine, and not switched from one to the other without repeated testing to ensure that hormone levels remain within normal ranges.   Health warnings are given to users of Clomipramine about the risks associated with discontinuing usage abruptly, including antidepressant discontinuation syndrome.

119.    In addition, branded versions of Clomipramine do not serve as economic substitutes for generic versions of these compounds because branded products generally maintain substantial price premiums over even their supra-competitively priced generic counterparts, making them inapt substitutes even when generic prices soar.

120.    Thus, purchasers of generic Clomipramine are held captive to the supracompetitive prices that resulted from Defendants' conspiracy to fix prices and allocate markets and customers.

### 5.    Standardized product

121.    A commodity-like product is one that is standardized across suppliers and allows for a high degree of substitutability among different suppliers in the market.   When products

offered by different suppliers are viewed as interchangeable by purchasers, it is easier for the suppliers to agree on prices for the goods in question and to monitor those prices effectively.

122.    Generic drugs of the same chemical composition are effectively commodity products because the primary mechanism through which they compete is price.  When approving an ANDA, the FDA confirms that a generic drug product is bioequivalent to the branded version of the drug.  This allows pharmacists to substitute that generic for the branded counterpart, as well as for any other generic that also is bioequivalent to the branded product.

123.    Defendants' generic Clomipramine products are bioequivalent generics of their branded counterparts, enabling pharmacists to substitute them (any of them) for branded products.

124.    Moreover, because generic Clomipramine products are interchangeable, there is little utility in attempting to distinguish the products based on quality, branding or service. Accordingly, manufacturers generally spend little effort advertising or detailing (the practice of providing promotional materials and free samples to physicians) their generic compounds.  The primary means for one generic manufacturer to differentiate its product from another's is through price competition.[46]  The need to compete on price can drive producers of commodity products to conspire—as they did here—to fix prices.

### 6.    Inter-competitor contacts and communications

125.    As discussed above, Defendants' representatives met at conferences convened by customers and trade associations of customers (███████████ and NACDS), private industry dinners, and similar events.  Moreover, Defendants are members of and/or participants of the GPhA; thus, their representatives have many opportunities to meet and conspire at industry

---

[46] *See, e.g.*, GAO Report at 23 ("If another manufacturer offers a lower price to a customer, manufacturers we interviewed indicated that they are usually asked to match it or risk losing market share to the other manufacturer.").

meetings.  As noted in press reports, "prosecutors are taking a close look at trade associations as part of their investigation as having been one potential avenue for facilitating the collusion between salespeople at different generic producers."[47]

126.    The State AG Complaint alleges that Defendants routinely coordinated their schemes through direct interaction with their competitors at industry trade shows, customer conferences, and other events.  For example, Defendants Glazer and Malek admitted at their guilty plea hearings to engaging in discussions and attending meetings with competitors, during which they reached agreements to allocate customers, rig bids and fix prices of doxycycline hyclate and glyburide.

127.    DOJ's and the Connecticut AG's investigations, and the grand jury subpoenas and investigative demands that have issued in conjunction with them, focus on inter-competitor communications.  These types of communications are not unique or isolated, but are rampant; "[g]eneric drug manufacturers operate, through their respective senior leadership and marketing and sales executives, in a manner that fosters and promotes routine and direct interaction among their competitors."[48]  The sheer number of companies implicated in the investigations highlights the prevalence in the generic drug industry of the types of contacts and communications that facilitate collusion:

> (a)    **Actavis**:  In February 2016, Actavis's predecessor, Allergan plc, disclosed that it received a DOJ subpoena "seeking information relating to the marketing and pricing of certain of the Company's

---

[47] PaRR Report.

[48] State AG Amended Complaint ¶ 7.

generic products and communications with competitors about such products."[49]

(b) **Aurobindo**: Aurobindo has disclosed receipt of a subpoena relating to the DOJ's generic drug investigation.[50]  The company stated that it "received a subpoena in Mar[ch] 2016 requesting non-product specific information."[51]

(c) **Citron**:  In December 2016, Aceto Corporation (which purchased Citron's generic drugs assets) disclosed that DOJ "executed a search warrant against the Company and also served a subpoena requesting documents and other information concerning potential antitrust violations in the sale of Glyburide, Glyburide/Metformin, and Fosinopril HCTZ products."  The Connecticut AG requested that Citron produce all documents produced to DOJ.[52]

(d) **Dr. Reddy's**:  In November 2016, Dr. Reddy's disclosed that it received subpoenas from DOJ and the Connecticut AG "seeking information relating to the marketing, pricing and sale of certain . . . generic products and any communications with competitors about such products."[53]

(e) **Heritage**:  As a private company, Heritage is not required to make public disclosures.  Nonetheless, in the wake of the criminal guilty pleas by two of its executives, Heritage confirmed that it is "fully cooperating" with DOJ[54] and press reports indicate that Heritage has

---

[49] Allergan, SEC 2015 Form 10-K (Feb. 26, 2016), at 27, *available at* https://www.sec.gov/Archives/edgar/data/1578845/000156459016013478/agn-10k_20151231.htm

[50] Zeba Siddiqui, "India's Aurobindo shares hit nine-month low on US price-fixing lawsuit," Reuters (Dec 16, 2016), *available at* http://www.reuters.com/article/us-aurobindo-pharm-stocks-idUSKBN1450DV

[51] Aurobindo Pharma, Ltd., BSE Disclosure (Dec. 16, 2016), *available at* http://www.bseindia.com/xml-data/corpfiling/AttachHis/3C8E03C7_A46F_4792_AED5_197E6961A77E_125855.pdf

[52] Aceto Corp., SEC Form 8-K, Ex. 99.5, *available at* https://www.sec.gov/Archives/edgar/data/2034/000157104916020771/t1600804_ex99-5.htm

[53] Dr. Reddy's, SEC Form 6-K (Nov. 10, 2016), *available at* http://www.drreddys.com/investors/reports-and-filings/sec-filings/?year=FY17

[54] Tom Schoenberg , David McLaughlin & Sophia Pearson, "U.S. Generic Drug Probe Seen Expanding After Guilty Pleas," Bloomberg (Dec. 14, 2016), *available at* https://www.bloomberg.com/news/articles/2016-12-14/u-s-files-first-charges-in-generic-drug-price-fixing-probe

applied to DOJ's leniency program seeking amnesty for a cartel violation.

(f) **Impax**:  In July 2014, Impax disclosed that it received a subpoena from the Connecticut AG concerning sales of generic digoxin.[55]  In November 2014, Impax disclosed that an employee received a broader federal grand jury subpoena that requested testimony and documents about "any communication or correspondence with any competitor (or an employee of any competitor) in the sale of generic prescription medications."[56]  In February 2016, Impax disclosed that it received a DOJ subpoena requesting "information and documents regarding the sales, marketing, and pricing of certain generic prescription medications.   In particular . . . digoxin tablets, terbutaline sulfate tablets, prilocaine/lidocaine cream, and calcipotriene topical solution."[57]

(g) **Lannett**:  In July 2014, Lannett disclosed that it received a subpoena from the Connecticut AG relating to its investigation into the price-fixing of digoxin.[58]  On November 3, 2014, Lannett disclosed that a Senior Vice President of Sales and Marketing was served with a grand jury subpoena "relating to a federal investigation of the generic pharmaceutical industry into possible violations of the Sherman Act."  The subpoena also requested "corporate documents of the Company relating to communications or correspondence with competitors regarding the sale of generic prescription medications, but is not specifically directed to any particular product and is not limited to any particular time period."[59]   On August 27, 2015, Lannett further explained that DOJ sought, among other things, "communications or correspondence with competitors regarding the sale of generic prescription medications, and the marketing, sale, or

---

[55] Impax SEC Form 8-K (July 15, 2014), *available at* https://www.sec.gov/Archives/edgar/data/1003642/000143774914012809/ipxl20140715_8k.htm

[56] Impax SEC Form 8-K (Nov. 6, 2014), *available at* https://www.sec.gov/Archives/edgar/data/1003642/000119312514402210/d816555d8k.htm

[57] Impax, SEC 2015 Form 10-K (Feb. 22, 2016), at F-53, *available at* https://www.sec.gov/Archives/edgar/data/1003642/000143774916025780/ipxl20151231_10k.htm

[58] Lannett press release (July 16, 2014), *available at* http://lannett.investorroom.com/2014-07-16-Lannett-Receives-Inquiry-From-Connecticut-Attorney-General

[59] Lannett, SEC Form 10-Q (Nov. 6, 2014) at 16, *available at* https://www.sec.gov/Archives/edgar/data/57725/000110465914077456/a14-20842_110q.htm

pricing of certain products, generally for the period of 2005 through the dates of the subpoenas."[60]

(h)    **Mayne**:  On August 25, 2016, Mayne Pharma Group Limited (the parent of Mayne) disclosed that it was "one of numerous generic pharmaceutical companies to receive a subpoena . . . seeking information relating to marketing, pricing and sales of select generic drugs" and that it had received a subpoena from the Connecticut AG seeking similar information.[61]   On November 4, 2016, Mayne Pharma Group Limited issued a press release stating:  "Previously on 28 Jun[e] 2016, Mayne Pharma Group Limited disclosed that it was one of several generic companies to receive a subpoena from the Antitrust Division of the US Department of Justice (DOJ) seeking information relating to the marketing, pricing and sales of select generic products.  The investigation relating to Mayne Pharma is focused on doxycycline hyclate delayed-release tablets (generic) and potassium chloride powders."[62]

(i)    **Mylan**:  In February 2016, Mylan disclosed that it received a DOJ subpoena "seeking information relating to . . . generic Doxycycline" and a similar subpoena from the Connecticut AG seeking "information relating to…certain of the Company's generic products (including Doxycycline) and communications with competitors about such products."[63]   On Nov. 9, 2016, Mylan disclosed that "certain employees and a member of senior management, received subpoenas from the DOJ seeking additional information relating to the marketing, pricing and sale of our generic Cidofovir, Glipizide-metformin, Propranolol and Verapamil products" and that "[r]elated search warrants also were executed" in connection with DOJ's investigation.[64]

---

[60] Lannett, SEC Form 10-K (Aug. 27, 2015) at 18, available at
http://www.sec.gov/Archives/edgar/data/57725/000110465915062047/a15-13005_110k.htm

[61] Mayne Pharma, 2016 Annual Report (Aug. 25, 2016), at 75, *available at*
https://www.maynepharma.com/media/1788/2016-mayne-pharma-annual-report.pdf

[62] Mayne Pharma, Update on DOJ Investigation (Nov. 4, 2016), *available at*
http://asxcomnewspdfs.fairfaxmedia.com.au/2016/11/04/01798874-137879061.pdf

[63] Mylan, SEC 2015 Form 10-K (Feb. 16, 2016), at 160, *available at*
https://www.sec.gov/Archives/edgar/data/1623613/000162361316000046/myl10k_20151231xdoc.htm

[64] Mylan SEC Form 10-Q, at 58 (Nov. 9, 2016), *available at*
https://www.sec.gov/Archives/edgar/data/1623613/000162361316000071/myl10q_20160930xdoc.htm

(j)    **Par**:  In March 2015, Par disclosed that it received subpoenas from the Connecticut AG and DOJ relating to digoxin and doxycycline.[65] In November 2015, Endo International plc, the parent company of Par, elaborated: "In December 2014, our subsidiary, Par, received a Subpoena to Testify Before Grand Jury from the Antitrust Division of the DOJ and issued by the U.S. District Court for the Eastern District of Pennsylvania. The subpoena requests documents and information focused primarily on product and pricing information relating to Par's authorized generic version of Lanoxin (digoxin) oral tablets and Par's generic doxycycline products, and on communications with competitors and others regarding those products. Par is currently cooperating fully with the investigation."[66] Endo also disclosed that in December 2015 it "received Interrogatories and Subpoena Duces Tecum from the State of Connecticut Office of Attorney General requesting information regarding pricing of certain of its generic products, including Doxycycline Hyclate, Amitriptyline Hydrochloride, Doxazosin Mesylate, Methotrexate Sodium and Oxybutynin Chloride."[67]

(k)    **Perrigo**:  On May 2, 2017, Perrigo disclosed that "search warrants were executed at the Company's corporate offices associated with an ongoing investigation by the U.S. Department of Justice Antitrust Division related to drug pricing in the pharmaceutical industry."[68]

(l)    **Sandoz**:  In March 2016, Sandoz and Fougera Pharmaceuticals Inc. (a wholly owned subsidiary of Sandoz) "received a subpoena from the Antitrust Division of the US Department of Justice (DoJ) requesting documents related to the marketing and pricing of generic pharmaceutical products . . . and related communications with competitors."[69]

(m)    **Sun**:  On May 27, 2016, Sun Pharmaceutical Industries, Ltd. (the parent of Sun) stated in a filing with the National Stock Exchange of India that one of its U.S subsidiaries, namely Sun, "received a

---

[65] Par Pharmaceuticals Companies, Inc., SEC 2014 Form 10-K (Mar. 12, 2015) at 37, *available at* https://www.sec.gov/Archives/edgar/data/878088/000087808815000002/prx-20141231x10k.htm

[66] Endo International plc, SEC Form 10-Q (March 31, 2016) at 30, *available at* https://www.sec.gov/Archives/edgar/data/1593034/000159303416000056/endp-3312016x10q.htm

[67] *Id.* at 31.

[68] Perrigo Press Release (May 2, 2017), *available at* http://perrigo.investorroom.com/2017-05-02-Perrigo-Discloses-Investigation

[69] Novartis 2016 Financial Report at 217, *available at* https://www.novartis.com/sites/www.novartis.com/files/ar-2016-financial-report-en.pdf

grand jury subpoena from the United States Department of Justice, Antitrust Division seeking documents . . . relating to corporate and employee records, generic pharmaceutical products and pricing, communications with competitors and others regarding the sale of generic pharmaceutical products, and certain other related matters."[70]

(n)    **Taro**:  In September 2016, Taro disclosed that the Company "and two senior officers" received DOJ subpoenas seeking documents relating to "generic pharmaceutical products and pricing, communications with competitors and others regarding the sale of generic pharmaceutical products, and certain other related matters."[71]

(o)    **Teva**:  In August 2016, Teva disclosed that it received subpoenas from DOJ and the Connecticut AG seeking documents and other information "relating to the marketing and pricing of certain of Teva USA's generic products and communications with competitors about such products."[72]

(p)    **Zydus**:  Press reports have stated the Zydus is a target of DOJ's generic drugs price-fixing investigation.[73]

## IX.    THE STATUTES OF LIMITATIONS DO NOT BAR PLAINTIFFS' CLAIMS

### A.    The statutes of limitations did not begin to run because Plaintiffs did not and could not discover Defendants' unlawful conspiracy

128.    Plaintiffs had no knowledge of the combination or conspiracy alleged herein, or of facts sufficient to place them on inquiry notice of the claims set forth herein, until (at the earliest) Defendants' and other generic drug manufacturers' disclosures of the existence of the government

---

[70] Sun Pharmaceuticals Indus., Ltd., BSE Disclosure (May 27, 2016), *available at* http://www.bseindia.com/xml-data/corpfiling/AttachHis/8E568708_8D00_472E_B052_666C76A4263D_081648.pdf

[71] Taro, SEC Form 6-K (Sept. 9, 2016), *available at* https://www.sec.gov/Archives/edgar/data/906338/000115752316006685/a51417528.htm

[72] Teva, SEC Form 6-K at 25 (Aug. 4, 2016), *available at* https://www.sec.gov/Archives/edgar/data/818686/000119312516671785/d187194d6k.htm

[73] *See* Rupali Mukherjeel, "US polls, pricing pressure may hit Indian pharma cos," The Times of India (Nov. 8, 2016), *available at* http://timesofindia.indiatimes.com/business/india-business/US-polls-pricing-pressure-may-hit-Indian- pharma-cos/articleshow/55301060.cms

investigations and subpoenas.  Prior to that time, no information in the public domain or available to Plaintiffs suggested that any Defendant was involved in a criminal conspiracy to fix prices for generic Clomipramine.

129.    No information evidencing antitrust violations was available in the public domain prior to the public announcements of the government investigations that revealed sufficient information to suggest that any of the Defendants was involved in a criminal conspiracy to fix prices for generic Clomipramine.

130.    Plaintiffs are purchasers who indirectly purchased generic Clomipramine manufactured by one or more Defendants.  They had no direct contact or interaction with any of the Defendants in this case and had no means from which they could have discovered Defendants' conspiracy.

131.    Defendants repeatedly and expressly stated throughout the Class Period, including on their public Internet websites, that they maintained antitrust/fair competition policies which prohibited the type of collusion alleged in this Complaint.  For example:

> (a)    Mylan's Code of Conduct and Business Ethics states:  "Mylan is committed to complying with applicable antitrust and fair competition laws."[74]

> (b)    Novartis's (the parent of Sandoz) Code of Conduct provides:  "We are committed to fair competition and will not breach competition laws and regulations."[75]

> (c)    Taro's Code of Conduct provides:  "we do not discuss any of the following topics with our competitors: prices or price-fixing, customer or market allocation, bids or bid-rigging, any topic that seems to be about restricting competition.  If a competitor attempts to engage you in a discussion on any of these topics, make it clear

---

[74] Mylan Code of Business Conduct and Ethics, *available at* https://www.mylan.com/-/media/mylancom/files/code%20of%20business%20conduct%20and%20ethics.pdf

[75] Novartis Code of Conduct, *available at* https://www.novartis.com/sites/www.novartis.com/files/code-of-conduct-english.pdf

that you do not wish to participate. Leave the conversation immediately, and report the matter to Corporate Compliance."[76]

132.    It was reasonable for members of the Class to believe that Defendants were complying with their own antitrust policies.

133.    For these reasons, the statutes of limitations as to Plaintiffs' claims under the federal and state common laws identified herein did not begin to run, and have been tolled with respect to the claims that Plaintiffs have alleged in this Complaint.

### B.    Active concealment tolled the statutes of limitations

134.    In the alternative, application of the doctrine of fraudulent concealment tolled the statutes of limitations on the claims asserted by Plaintiffs. Plaintiffs had no knowledge of the combination or conspiracy alleged in this Complaint, or of facts sufficient to place them on inquiry notice of their claims, until Defendants disclosed the existence of government investigations and subpoenas. Prior to that time, no information in the public domain or available to Plaintiffs suggested that any Defendant was involved in a criminal conspiracy to fix prices for generic Clomipramine. Defendants actively concealed, suppressed, and omitted to disclose material facts to Plaintiffs and members of the Classes concerning Defendants' unlawful activities to artificially inflate prices for generic Clomipramine.

### 1.    Active concealment of the conspiracy

135.    Defendants engaged in an illegal scheme to fix prices, allocate customers and rig bids. Criminal and civil penalties for engaging in such conduct are severe. Not surprisingly, Defendants took affirmative measures to conceal their conspiratorial conduct.

136.    As explained in the State AG Complaint, the nature of the generic drug industry—which allows for frequent and repeated face-to-face meetings among competitors—means that

---

[76] Taro Code of Conduct, *available at* http://www.taro.com/media/oMedia/TaroCOC.pdf

"Most of the conspiratorial communications were intentionally done in person or by cell phone, in an attempt to avoid creating a record of their illegal conduct. The generic drug industry, through the aforementioned opportunities to collude at trade shows, customer events and smaller more intimate dinners and meetings, allowed these communications to perpetuate."[77]

137.    The Defendants also gave pretextual reasons for price increases.  For example, defendant Mylan's parent company, Mylan N.V., stated in documents filed with the SEC in 2015 that "[t]he pharmaceutical industry is highly competitive" and that it "face[s] vigorous competition from other pharmaceutical manufacturers that threatens the commercial acceptance and pricing of our products."[78]  Similarly, Taro Pharmaceutical Industries Ltd. stated in a 2014 annual filing with the SEC:  "The pharmaceutical industry in which we operate is intensely competitive.  The competition which we encounter has an effect on our product prices, market share, revenue and profitability."[79]  Sandoz's parent company, Novartis AG, told the SEC in 2014:  "Competition within the industry is intense and extends across a wide range of commercial activities, including pricing, product characteristics, customer service, sales and marketing, and research and development."[80]

138.    These types of false statements and others made by Defendants helped conceal the illegal conspiracy entered into by Defendants to fix, stabilize, maintain and raise the price of generic Clomipramine to inflated, supracompetitive levels.

---

[77] State AG Amended Complaint ¶ 13.

[78] Mylan N.V., SEC Form 10-Q (May 8, 2015) at 76, *available at* http://investor.mylan.com/secfiling.cfm?filingID=1623613-15-9&CIK=1623613.

[79] Taro Pharmaceutical Industries Ltd., SEC Form 20-F (July 2, 2014) at 3, *available at* http://phx.corporate-ir.net/phoenix.zhtml?c=114698&p=irol-sec.

[80] Novartis AG, SEC Form 20-F (Jan. 29, 2014) at 54, *available at* https://www.sec.gov/Archives/edgar/data/1114448/000104746914000415/a2217883z20-f.htm.

### 2. Plaintiffs exercised reasonable diligence

139. Defendants' anticompetitive conspiracy, by its very nature, was self-concealing. Generic drugs are not exempt from antitrust regulation, and thus, before the disclosure of the government investigations, Plaintiffs reasonably considered the markets to be competitive. Accordingly, a reasonable person under the circumstances would not have been alerted to investigate the legitimacy of Defendants' prices before these disclosures.

140. Because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to conceal their illicit conduct, Plaintiffs and the Classes could not have discovered the conspiracy at an earlier date by the exercise of reasonable diligence.

141. Therefore, the running of any statutes of limitations has been tolled for all claims alleged by Plaintiffs and the Classes as a result of Defendants' anticompetitive and unlawful conduct. Despite the exercise of reasonable diligence, Plaintiffs and Members of the Classes were unaware of Defendants' unlawful conduct, and did not know that they were paying supracompetitive prices throughout the United States during the Class Period.

142. For these reasons, Plaintiffs' claims are timely under all of the federal, state and common laws identified herein.

### X. CONTINUING VIOLATIONS

143. This Complaint alleges a continuing course of conduct (including conduct within the limitations periods), and Defendants' unlawful conduct has inflicted continuing and accumulating harm within the applicable statutes of limitations. Thus, Plaintiffs and the members of the Damages Class can recover for damages that they suffered during any applicable limitations period.

## XI.    DEFENDANTS' ANTITRUST VIOLATIONS

144.    During the Class Period, set forth below, Defendants engaged in a continuing agreement, understanding, and conspiracy in restraint of trade to allocate customers, rig bids, and fix, raise, and/or stabilize prices for generic Clomipramine sold in the United States.

145.    In formulating and effectuating the contract, combination or conspiracy, Defendants identified above and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which were to allocate customers, rig bids and artificially fix, raise, maintain, and/or stabilize the price of generic Clomipramine sold in the United States. These activities included the following:

> (a)    Defendants participated in meetings and/or conversations regarding the price of generic Clomipramine in the United States;

> (b)    Defendants agreed during those meetings and conversations to charge prices at specified levels and otherwise to increase and/or maintain prices of generic Clomipramine sold in the United States;

> (c)    Defendants agreed during those meetings and conversations to allocate customers, rig bids, and fix the price of generic Clomipramine; and

> (d)    Defendants issued price announcements and price quotations in accordance with their agreements.

146.    Defendants and their co-conspirators engaged in the activities described above for the purpose of effectuating the unlawful agreements described in this Complaint.

147.    During and throughout the period of the conspiracy alleged in this Complaint, Plaintiffs and members of the Classes indirectly purchased generic Clomipramine at inflated and supracompetitive prices.

148.    Defendants' contract, combination and conspiracy constitutes an unreasonable restraint of trade and commerce in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3) and the laws of various IRP Damages Jurisdictions enumerated below.

149.    As a result of Defendants' unlawful conduct, Plaintiffs and the other members of the Classes have been injured in their business and property in that they have paid more for generic Clomipramine than they would have paid in a competitive market.

150.    General economic principles recognize that any overcharge at a higher level of distribution generally results in higher prices at every level below.  Moreover, the institutional structure of pricing and regulation in the pharmaceutical drug industry assures that overcharges at the higher level of distribution are passed on to independent pharmacies such as Plaintiffs. Wholesalers and retailers passed on the inflated prices to Plaintiffs and members of the Class.  The impairment of generic competition at the direct purchaser level similarly injured Plaintiffs who were equally denied the opportunity to purchase less expensive generic versions of Clomipramine.

151.    The unlawful contract, combination and conspiracy has had the following effects, among others:

(a)    price competition in the market for generic Clomipramine has been artificially restrained;

(b)    prices for generic Clomipramine sold by Defendants have been raised, fixed, maintained, or stabilized at artificially high and non-competitive levels; and

(c)    independent pharmacy purchasers of generic Clomipramine sold by Defendants have been deprived of the benefit of free and open competition in the market for generic Clomipramine.

## XII.    CLASS ACTION ALLEGATIONS

152.    Plaintiffs bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, seeking equitable and injunctive relief on behalf of the following class (the "Nationwide Class"):

All privately held pharmacies in the United States and its territories that indirectly purchased Defendants' generic Clomipramine products (including 25, 50 and 75 mg capsules) from May 1, 2013 through the present.

This class excludes: (a) Defendants, their officers, directors, management, employees, subsidiaries and affiliates; (b) all persons or entities who purchased Clomipramine products directly from Defendants; (c) any pharmacies owned in part by judges or justices involved in this action or any members of their immediate families; (d) all pharmacies owned or operated by publicly traded companies.

153.    Plaintiffs also bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking damages pursuant to the common law of unjust enrichment and the state antitrust, unfair competition, and consumer protection laws of the states and territories listed below (the "IRP Damages Jurisdictions")[81] on behalf of the following class (the "Damages Class"):

All privately held pharmacies in the IRP Damages Jurisdictions that indirectly purchased Defendants' generic Clomipramine products (including 25, 50 and 75 mg capsules) from May 1, 2013 through the present.[82]

This class excludes: (a) Defendants, their officers, directors, management, employees, subsidiaries and affiliates; (b) all persons or entities who purchased Clomipramine products directly from Defendants; (c) any pharmacies owned in part by judges or justices involved in this action or any members of their immediate families; (d) all pharmacies owned or operated by publicly traded companies.

154.    The Nationwide Class and the Damages Class are referred to herein as the "Classes."

---

[81] The IRP Damages Jurisdictions, for purposes of this Complaint, are: Alabama, Alaska, Arizona, Arkansas, California, Colorado, Delaware, Florida, Georgia, Idaho, Illinois, Iowa, Kansas, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington, West Virginia, Wisconsin and Wyoming, the District of Columbia, Puerto Rico, and the U.S. Virgin Islands.

[82] Plaintiffs may seek to certify state classes rather than a single Damages Class. See ¶ 160.

155.    While Plaintiffs do not know the exact number of the members of the Classes, rosters of members of national independent pharmacy organizations indicate that there are at least 20,000 members in each Class.

156.    Common questions of law and fact exist as to all members of the Classes. This is particularly true given the nature of Defendants' conspiracy, which was generally applicable to all the members of both Classes, thereby making appropriate relief with respect to the Classes as a whole. Such questions of law and fact common to the Classes include, but are not limited to:

(a)    Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain and/or stabilize prices of generic Clomipramine and/or engaged in market allocation for generic Clomipramine sold in the United States;

(b)    The identity of the participants of the alleged conspiracy;

(c)    The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

(d)    Whether the alleged conspiracy violated the Sherman Act, as alleged in the First Count;

(e)    Whether the alleged conspiracy violated state antitrust and unfair competition laws, and/or state consumer protection laws, as alleged in the Second and Third Counts;

(f)    Whether Defendants unjustly enriched themselves to the detriment of the Plaintiffs and the members of the Classes, thereby entitling Plaintiffs and the members of the Classes to disgorgement of all benefits derived by Defendants, as alleged in the Fourth Count;

(g)    Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiffs and the members of the Classes;

(h)    The effect of the alleged conspiracy on the prices of generic Clomipramine sold in the United States during the Class Period;

(i)    Whether the Defendants and their co-conspirators actively concealed, suppressed, and omitted to disclose material facts to Plaintiffs and members of the Classes concerning Defendants' unlawful activities to artificially inflate prices for generic Clomipramine, and/or fraudulently concealed the unlawful conspiracy's existence from Plaintiffs and the other members of the Classes;

(j)    The appropriate injunctive and related equitable relief for the Nationwide Class; and

(k)    The appropriate class-wide measure of damages for the Damages Class.

157.    Plaintiffs' claims are typical of the claims of the members of the Classes.  Plaintiffs and all members of the Classes are similarly affected by Defendants' wrongful conduct in that they paid artificially inflated prices for generic Clomipramine purchased indirectly from Defendants and/or their co-conspirators. Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes.

158.    Plaintiffs will fairly and adequately protect the interests of the Classes. Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Classes. Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

159.    The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

160.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual

actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action. Plaintiffs reserve the discretion to certify the Damages Class as separate classes for each of the IRP Damages Jurisdictions or as separate classes for certain groups of IRP Damages Jurisdictions, should the Court's subsequent decisions in this case render that approach more efficient. Whether certified together or separately, the total number and identity of the members of the Damages Class would remain consistent.

161.    The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## XIII.   CAUSES OF ACTIONS

### FIRST COUNT

#### Violation of Sections 1 and 3 of the Sherman Act
#### (on behalf of Plaintiffs and the Nationwide Class)

162.    Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

163.    Defendants and their unnamed co-conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. § 1, 3).

164.    During the Class Period, Defendants and their co-conspirators entered into a continuing agreement, understanding and conspiracy in restraint of trade to artificially allocate

customers, rig bids and raise, maintain and fix prices for generic Clomipramine, thereby creating anticompetitive effects.

165.    The conspiratorial acts and combinations have caused unreasonable restraints in the market for generic Clomipramine.

166.    As a result of Defendants' unlawful conduct, Plaintiffs and other similarly situated independent pharmacies in the Nationwide Class who purchased generic Clomipramine have been harmed by being forced to pay inflated, supracompetitive prices for generic Clomipramine.

167.    In formulating and carrying out the alleged agreement, understanding and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including, but not limited to, the acts, practices and course of conduct set forth herein.

168.    Defendants' conspiracy had the following effects, among others:

(a)  Price competition in the market for generic Clomipramine has been restrained, suppressed, and/or eliminated in the United States;

(b)  Prices for generic Clomipramine provided by Defendants and their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the United States; and

(c)  Plaintiffs and members of the Nationwide Class who purchased generic Clomipramine indirectly from Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

169.    Plaintiffs and members of the Nationwide Class have been injured and will continue to be injured in their business and property by paying more for generic Clomipramine purchased indirectly from Defendants and the co-conspirators than they would have paid and will pay in the absence of the conspiracy.

170.    Defendants' contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

171.    Plaintiffs and members of the Nationwide Class are entitled to an injunction against Defendants, preventing and restraining the continuing violations alleged herein.

## SECOND COUNT

### Violation of State Antitrust Statutes[83]
### (on behalf of Plaintiffs and the Damages Class)

172.    Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

173.    During the Class Period, Defendants and their co-conspirators engaged in a continuing contract, combination or conspiracy with respect to the sale of generic Clomipramine in unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

174.    The contract, combination, or conspiracy consisted of an agreement among Defendants and their co-conspirators to fix, raise, inflate, stabilize, and/or maintain the prices of generic Clomipramine and to allocate customers for generic Clomipramine in the United States.

175.    In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including:

> (a)    participating in meetings and conversations among themselves in the United States and elsewhere during which they agreed to price generic Clomipramine at certain levels, and otherwise to fix, increase, inflate, maintain, or stabilize effective prices paid by Plaintiffs and members

---

[83] Statutory antitrust violations are alleged herein for the following jurisdictions: Alabama, Arizona, California, District of Columbia, Illinois, Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia and Wisconsin.

of the Damages Class with respect to generic Clomipramine provided in the United States; and

(b)  participating in meetings and trade association conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

176.  Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreement to allocate customers, rig bids, and fix prices for generic Clomipramine. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

177.  In addition, Defendants have profited significantly from the conspiracy. Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of Plaintiffs and the members of the Damages Class.

178.  Accordingly, Plaintiffs and the members of the Damages Class in each of the following jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the following state laws.

179.  Defendants' anticompetitive acts described above were knowing, willful and constitute violations or flagrant violations of the following state antitrust statutes:

180.  **Alabama:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Alabama Code § 6-5-60, *et seq*. Defendants' combinations and conspiracy had the following effects: (1) price competition for generic Clomipramine was restrained, suppressed, and eliminated throughout Alabama; (2) generic Clomipramine prices were raised, fixed, maintained and stabilized at artificially high levels throughout Alabama. During the Class Period, Defendants' illegal conduct substantially affected Alabama commerce. By reason of the foregoing, Defendants

entered into an agreement in restraint of trade in violation of Alabama Code § 6-5-60, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Alabama Code § 6-5-60, *et seq.*

181.    **Arizona:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Arizona Revised Statutes, § 44-1401, *et seq.* Defendants' combination and conspiracy had the following effects: (1) price competition for generic Clomipramine was restrained, suppressed, and eliminated throughout Arizona; (2) generic Clomipramine prices were raised, fixed, maintained and stabilized at artificially high levels throughout Arizona. During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce. Defendants' violations of Arizona law were flagrant.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants entered into an agreement in restraint of trade in violation of Ariz. Rev. Stat. § 44-1401, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Ariz. Rev. Stat. § 44-1401, *et seq.*

182.    **California:** Defendants have entered into an unlawful agreement in restraint of trade in violation of California Business and Professions Code § 16700 *et seq.* During the Class Period, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of California Business and Professions Code §16720. Defendants, and each of them, have acted in violation of § 16720 to fix, raise, stabilize, and maintain prices of generic Clomipramine at supracompetitive levels. The aforesaid violations of § 16720 consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which

were to fix, raise, maintain, and stabilize the prices of generic Clomipramine. For the purpose of

forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those

things which they combined and conspired to do, including, but not limited to, the acts, practices

and course of conduct set forth above and creating a price floor, fixing, raising, and stabilizing the

price of generic Clomipramine. The combination and conspiracy alleged herein has had, inter alia,

the following effects: (1) price competition for generic Clomipramine has been restrained,

suppressed, and/or eliminated in the State of California; (2) prices for generic Clomipramine

provided by Defendants and their co-conspirators have been fixed, raised, stabilized, and pegged

at artificially high, non-competitive levels in the State of California; and (3) those who purchased

generic Clomipramine indirectly from Defendants and their co-conspirators have been deprived of

the benefit of free and open competition. As a direct and proximate result of Defendants' unlawful

conduct, Plaintiffs and members of the Damages Class have been injured in their business and

property in that they paid more for generic Clomipramine than they otherwise would have paid in

the absence of Defendants' unlawful conduct. During the Class Period, Defendants' illegal conduct

substantially affected California commerce. As a result of Defendants' violation of § 16720,

Plaintiffs and members of the Damages Class seek treble damages and their cost of suit, including

a reasonable attorney's fee, pursuant to California Business and Professions Code § 16750(a).

183.    **District of Columbia:** Defendants have entered into an unlawful agreement in

restraint of trade in violation of District of Columbia Code Annotated § 28-4501, *et seq.*

Defendants' combination and conspiracy had the following effects: (1) generic Clomipramine

price competition was restrained, suppressed, and eliminated throughout the District of Columbia;

(2) generic Clomipramine prices were raised, fixed, maintained and stabilized at artificially high

levels throughout the District of Columbia; (3) Plaintiffs and members of the Damages Class,

including those who resided in the District of Columbia and/or purchased generic Clomipramine in the District of Columbia that were shipped by Defendants or their co-conspirators into the District of Columbia, were deprived of free and open competition, including in the District of Columbia; and (4) Plaintiffs and members of the Damages Class, including those who resided in the District of Columbia and/or purchased generic Clomipramine in the District of Columbia that were shipped by Defendants or their co-conspirators, paid supracompetitive, artificially inflated prices for generic Clomipramine, including in the District of Columbia. During the Class Period, Defendants' illegal conduct substantially affected District of Columbia commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of District of Columbia Code Ann. § 28-4501, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under District of Columbia Code Ann. § 28-4501, *et seq.*

184. **Illinois:** Defendants have entered into an unlawful agreement in restraint of trade in violation of the Illinois Antitrust Act (740 Illinois Compiled Statutes 10/1, *et seq.*) Defendants' combination or conspiracy had the following effects: (1) generic Clomipramine price competition was restrained, suppressed, and eliminated throughout Illinois; (2) generic Clomipramine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Illinois. During the Class Period, Defendants' illegal conduct substantially affected Illinois commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under the Illinois Antitrust Act.

185.     **Iowa:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Iowa Code § 553.1, *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Clomipramine price competition was restrained, suppressed, and eliminated throughout Iowa; (2) generic Clomipramine prices were raised, fixed, maintained and stabilized at artificially high levels throughout Iowa. During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Iowa Code § 553.1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Iowa Code § 553, *et seq.*

186.     **Kansas:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Kansas Statutes Annotated, § 50-101, *et seq.* Defendants combined capital, skills or acts for the purposes of creating restrictions in trade or commerce of generic Clomipramine, increasing the prices of generic Clomipramine, preventing competition in the sale of generic Clomipramine, or binding themselves not to sell generic Clomipramine, in a manner that established the price of generic Clomipramine and precluded free and unrestricted competition among themselves in the sale of generic Clomipramine, in violation of Kan. Stat. Ann. § 50-101, *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Clomipramine price competition was restrained, suppressed, and eliminated throughout Kansas; (2) generic Clomipramine prices were raised, fixed, maintained and stabilized at artificially high levels throughout Kansas. During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce. By reason of the foregoing, Defendants have entered into an agreement in

restraint of trade in violation of Kansas Stat. Ann. § 50-101, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Kansas Stat. Ann. § 50-101, *et seq.*

187.    **Maine:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Maine Revised Statutes (Maine Rev. Stat. Ann. 10, § 1101, *et seq.*) Defendants' combination or conspiracy had the following effects: (1) generic Clomipramine price competition was restrained, suppressed, and eliminated throughout Maine; (2) generic Clomipramine prices were raised, fixed, maintained and stabilized at artificially high levels throughout Maine. During the Class Period, Defendants' illegal conduct substantially affected Maine commerce. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Maine Rev. Stat. Ann. 10, § 1101, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Maine Rev. Stat. Ann. 10, § 1101, *et seq.*

188.    **Michigan:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Michigan Compiled Laws Annotated § 445.771, *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Clomipramine price competition was restrained, suppressed, and eliminated throughout Michigan; (2) generic Clomipramine prices were raised, fixed, maintained and stabilized at artificially high levels throughout Michigan. During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Michigan Comp. Laws Ann. § 445.771, *et seq.* Accordingly, Plaintiffs and members

of the Damages Class seek all relief available under Michigan Comp. Laws Ann. § 445.771, *et seq.*

189.    **Minnesota:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Minnesota Annotated Statutes § 325D.49, *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Clomipramine price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) generic Clomipramine prices were raised, fixed, maintained and stabilized at artificially high levels throughout Minnesota. During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Minn. Stat. § 325D.49, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Minn. Stat. § 325D.49, *et seq.*

190.    **Mississippi:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Mississippi Code Annotated § 75-21-1, *et seq.* Trusts are combinations, contracts, understandings or agreements, express or implied when inimical to the public welfare and with the effect of, inter alia, restraining trade, increasing the price or output of a commodity, or hindering competition in the production and sale of a commodity. Miss. Code Ann. § 75-21-1. Defendants' combination or conspiracy was in a manner inimical to public welfare and had the following effects: (1) generic Clomipramine price competition was restrained, suppressed, and eliminated throughout Mississippi; (2) generic Clomipramine prices were raised, fixed, maintained and stabilized at artificially high levels throughout Mississippi. During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce. As a direct and

proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Mississippi Code Ann. § 75-21-1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Mississippi Code Ann. § 75-21-1, *et seq.*

191.    **Nebraska:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Nebraska Revised Statutes § 59-801, *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Clomipramine price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) generic Clomipramine prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nebraska. During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Neb. Rev. Stat. § 59-801, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Neb. Rev. Stat. § 59-801, *et seq.*

192.    **Nevada:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Nevada Revised Statutes Annotated § 598A.010, *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Clomipramine price competition was restrained, suppressed, and eliminated throughout Nevada; (2) generic Clomipramine prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nevada. During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class

have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Nevada Rev. Stat. Ann. § 598A.010, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nevada Rev. Stat. Ann. § 598A.010, *et seq.*

193.    **New Hampshire:** Defendants have entered into an unlawful agreement in restraint of trade in violation of New Hampshire Revised Statutes § 356:1, *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Clomipramine price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) generic Clomipramine prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Hampshire. During the Class Period, Defendants' illegal conduct substantially affected New Hampshire commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of N.H. Rev. Stat. § 356:1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under N.H. Rev. Stat. § 356:1, *et seq.*

194.    **New Mexico:** Defendants have entered into an unlawful agreement in restraint of trade in violation of New Mexico Statutes Annotated § 57-1-1, *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Clomipramine price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) generic Clomipramine prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Mexico. During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the

Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of New Mexico Stat. Ann. § 57-1-1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Mexico Stat. Ann. § 57-1-1, *et seq.*

195.    **New York:** Defendants have entered into an unlawful agreement in restraint of trade in violation of New York General Business Law § 340, *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Clomipramine price competition was restrained, suppressed, and eliminated throughout New York; (2) generic Clomipramine prices were raised, fixed, maintained and stabilized at artificially high levels throughout New York that were higher than they would have been absent Defendants' illegal acts. During the Class Period, Defendants' illegal conduct substantially affected New York commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of N.Y. Gen. Bus. Law § 340, *et seq.* The conduct set forth above is a per se violation of the Act. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under N.Y. Gen. Bus. Law § 340, *et seq.*

196.    **North Carolina:** Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Carolina General Statutes § 75-1, *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Clomipramine price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) generic Clomipramine prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Carolina. During the Class Period, Defendants' illegal conduct substantially affected North

Carolina commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of North Carolina Gen. Stat. § 75-1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Carolina Gen. Stat. § 75-1, *et seq.*

197.    **North Dakota:** Defendants have entered into an unlawful agreement in restraint of trade in violation of North Dakota Century Code § 51-08.1-01, *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Clomipramine price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) generic Clomipramine prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Dakota. During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of North Dakota Cent. Code § 51-08.1-01, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Dakota Cent. Code § 51-08.1-01, *et seq.*

198.    **Oregon:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Oregon Revised Statutes § 646.705, *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Clomipramine price competition was restrained, suppressed, and eliminated throughout Oregon; (2) generic Clomipramine prices were raised, fixed, maintained and stabilized at artificially high levels throughout Oregon. During the Class Period, Defendants'

illegal conduct had a substantial effect on Oregon commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Oregon Revised Statutes § 646.705, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Oregon Revised Statutes § 646.705, *et seq.*

199.    **Rhode Island:** Defendants have entered into an unlawful agreement in restraint of trade in violation of the Rhode Island Antitrust Act, Rhode Island General Laws § 6-36-1, *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Clomipramine price competition was restrained, suppressed, and eliminated throughout Rhode Island; (2) generic Clomipramine prices were raised, fixed, maintained and stabilized at artificially high levels throughout Rhode Island. During the Class Period, Defendants' illegal conduct had a substantial effect on Rhode Island commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property on or after July 15, 2013, and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of R.I. Gen. Laws § 6-36-1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under R.I. Gen. Laws § 6-36-1, *et seq.*

200.    **South Dakota:** Defendants have entered into an unlawful agreement in restraint of trade in violation of South Dakota Codified Laws Ann. § 37-1-3.1, *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Clomipramine price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) generic Clomipramine prices were raised, fixed, maintained and stabilized at artificially high levels throughout South

Dakota. During the Class Period, Defendants' illegal conduct had a substantial effect on South Dakota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of S.D. Codified Laws Ann. § 37-1-3.1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under S.D. Codified Laws Ann. § 37-1-3.1, *et seq.*

201.    **Tennessee:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Tennessee Code Annotated § 47-25-101, *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Clomipramine price competition was restrained, suppressed, and eliminated throughout Tennessee; (2) generic Clomipramine prices were raised, fixed, maintained and stabilized at artificially high levels throughout Tennessee. During the Class Period, Defendants' illegal conduct had a substantial effect on Tennessee commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Tennessee Code Ann. § 47-25-101, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Tennessee Code Ann. § 47-25-101, *et seq.*

202.    **Utah:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Utah Code Annotated § 76-10-3101, *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Clomipramine price competition was restrained, suppressed, and eliminated throughout Utah; (2) generic Clomipramine prices were raised, fixed, maintained and stabilized at artificially high levels throughout Utah. During the Class Period, Defendants'

illegal conduct had a substantial effect on Utah commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Utah Code Annotated § 76-10-3101, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Utah Code Annotated § 76-10-3101, *et seq.*

203.    **Vermont:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Vermont Stat. Ann. 9 § 2453, *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Clomipramine price competition was restrained, suppressed, and eliminated throughout Vermont; (2) generic Clomipramine prices were raised, fixed, maintained and stabilized at artificially high levels throughout Vermont. During the Class Period, Defendants' illegal conduct had a substantial effect on Vermont commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Vermont Stat. Ann. 9 § 2453, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Vermont Stat. Ann. 9 § 2453, *et seq.*

204.    **West Virginia:** Defendants have entered into an unlawful agreement in restraint of trade in violation of West Virginia Code § 47-18-1, *et seq.* Defendants' anticompetitive acts described above were knowing, willful, and constitute violations or flagrant violations of West Virginia Antitrust Act. Defendants' combination or conspiracy had the following effects: (1) generic Clomipramine price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) generic Clomipramine prices were raised, fixed, maintained and stabilized at

artificially high levels throughout West Virginia. During the Class Period, Defendants' illegal conduct had a substantial effect on West Virginia commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of W.Va. Code § 47-18-1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under W.Va. Code § 47-18-1, *et seq.*

205.    **Wisconsin:** Defendants have entered into an unlawful agreement in restraint of trade in violation of the Wisconsin Statutes § 133.01, *et seq.* Defendants' and their co-conspirators' anticompetitive activities have directly, foreseeably and proximately caused injury to Plaintiffs and members of the Classes in the United States. Specifically, Defendants' combination or conspiracy had the following effects: (1) generic Clomipramine price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) generic Clomipramine prices were raised, fixed, maintained and stabilized at artificially high levels throughout Wisconsin.  During the Class Period, Defendants' illegal conduct had a substantial effect on the people of Wisconsin and Wisconsin commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Wisc. Stat. § 133.01, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Wisc. Stat. § 133.01, *et seq.*

206.    **As to All Jurisdictions Above:** Plaintiffs and members of the Damages Class in each of the above jurisdictions have been injured in their business and property by reason of Defendants' unlawful combination, contract, conspiracy and agreement. Plaintiffs and members

70

of the Damages Class have paid more for generic Clomipramine than they otherwise would have paid in the absence of Defendants' unlawful conduct. This injury is of the type the antitrust laws of the above states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

207.    In addition, Defendants have profited significantly from the aforesaid conspiracy. Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of Plaintiffs and members of the Damages Class.

208.    Accordingly, Plaintiffs and members of the Damages Class in each of the above jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

## THIRD COUNT

### Violation of State Consumer Protection Statutes[84]
### (on behalf of Plaintiffs and the Damages Class)

209.    Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

210.    Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

---

[84] Statutory consumer protection / deceptive trade violations are alleged herein for the following jurisdictions: Alaska, Arkansas, California, Colorado, Delaware, Florida, Georgia, Michigan, Minnesota, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, South Carolina, South Dakota, West Virginia, Wisconsin and the U.S. Virgin Islands.

211.    **Alaska:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of Alaska Statute § 45.50.471, *et seq.*  Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which generic Clomipramine were sold, distributed, or obtained in Alaska and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. The aforementioned conduct on the part of Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Alaska law.  Defendants' unlawful conduct had the following effects: (1) generic Clomipramine price competition was restrained, suppressed, and eliminated throughout Alaska; (2) generic Clomipramine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Alaska. During the Class Period, Defendants' illegal conduct substantially affected Alaska commerce and consumers. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Alaska Stat. § 45.50.471, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

212.    **Arkansas:** Defendants have knowingly entered into an unlawful agreement in restraint of trade in violation of the Arkansas Code Annotated, § 4-88-101, *et seq.* Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which generic Clomipramine were sold, distributed, or obtained in Arkansas, and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. The aforementioned conduct on the part of Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10). Defendants' unlawful conduct had

the following effects: (1) generic Clomipramine price competition was restrained, suppressed, and eliminated throughout Arkansas; (2) generic Clomipramine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arkansas. During the Class Period, Defendants' illegal conduct substantially affected Arkansas commerce and consumers. As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10) and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

213. **California:** Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of California Business and Professions Code § 17200, *et seq*. During the Class Period, Defendants manufactured, marketed, sold, or distributed generic Clomipramine in California, and committed and continue to commit acts of unfair competition, as defined by § 17200, *et seq*. of the California Business and Professions Code, by engaging in the acts and practices specified above. This claim is instituted pursuant to §§ 17203 and 17204 of the California Business and Professions Code, to obtain restitution from these Defendants for acts, as alleged herein, that violated § 17200 of the California Business and Professions Code, commonly known as the Unfair Competition Law. Defendants' conduct as alleged herein violated § 17200. The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of California Business and Professions Code §17200, *et seq*., including, but not limited to, the following: (1) the violations of Section 1 of the Sherman Act, as

73

set forth above; (2) the violations of § 16720, *et seq*. of the California Business and Professions Code, set forth above. Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as described above, whether or not in violation of § 16720, *et seq*. of the California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent; (3) Defendants' acts or practices are unfair to purchasers of generic Clomipramine in the State of California within the meaning of § 17200, California Business and Professions Code; and (4) Defendants' acts and practices are fraudulent or deceptive within the meaning of Section 17200 of the California Business and Professions Code. Plaintiffs and members of the Damages Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that have been obtained by Defendants as a result of such business acts or practices. During the Class Period, Defendants' illegal conduct substantially affected California commerce and consumers. The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future. The unlawful and unfair business practices of Defendants, and each of them, as described above, have caused and continue to cause Plaintiffs and members of the Damages Class to pay supracompetitive and artificially-inflated prices for generic Clomipramine. Plaintiffs and members of the Damages Class suffered injury in fact and lost money or property as a result of such unfair competition. The conduct of Defendants as alleged in this Complaint violates § 17200 of the California Business and Professions Code. As alleged in this Complaint, Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Plaintiffs and members of the Damages Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings,

profits, compensation, and benefits that may have been obtained by Defendants as a result of such business practices, pursuant to the California Business and Professions Code, §§17203 and 17204.

214. **Colorado:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of Colorado Consumer Protection Act, Colorado Rev. Stat. § 6-1-101, *et seq*.  Defendants engaged in an unfair and deceptive trade practices during the course of their business dealings, which significantly impacted Plaintiffs as actual or potential consumers of the Defendants' goods and which caused Plaintiffs to suffer injury. Defendants took efforts to conceal their agreements from Plaintiffs. Defendants' unlawful conduct had the following effects: (1) generic Clomipramine price competition was restrained, suppressed, and eliminated throughout Colorado; (2) generic Clomipramine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Colorado. During the Class Period, Defendants' illegal conduct substantially affected Colorado commerce and consumers. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Colorado Rev. Stat. § 6-1-101, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute and as equity demands.

215. **Delaware:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Delaware Consumer Fraud Act, 6 Del. Code § 2511, *et seq*.  Defendants agreed to, and did in fact, act in restraint of trade or commerce in Delaware, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Clomipramine were sold, distributed, or obtained in Delaware. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Clomipramine. Defendants misrepresented to all purchasers during the Class Period that

Defendants' generic Clomipramine prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Clomipramine price competition was restrained, suppressed, and eliminated throughout Delaware; (2) generic Clomipramine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Delaware. During the Class Period, Defendants' illegal conduct had a substantial effect on Delaware commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Clomipramine, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Clomipramine at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of 6 Del. Code § 2511, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

216. **Florida:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq*. Defendants' unlawful conduct had the following effects: (1) generic Clomipramine price competition was restrained, suppressed, and eliminated throughout Florida; (2) generic Clomipramine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida. During the Class Period, Defendants' illegal conduct substantially affected Florida commerce and consumers. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Florida Stat. § 501.201, *et seq.*, and,

accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

217.  **Georgia:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Georgia Uniform Deceptive Trade Practices Act, Georgia Code § 10-1-370, *et seq.*  Defendants agreed to, and did in fact, act in restraint of trade or commerce in Georgia, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Clomipramine were sold, distributed, or obtained in Georgia. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Clomipramine. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Clomipramine prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Clomipramine price competition was restrained, suppressed, and eliminated throughout Georgia; (2) generic Clomipramine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Georgia. During the Class Period, Defendants' illegal conduct had a substantial effect on Georgia commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above and are threatened with further injury. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Clomipramine, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Clomipramine at prices set by a free and fair market.

Defendants' misleading conduct and unconscionable activities constitute violations of Georgia Code § 10-1-370, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute and as equity demands.

218.    **Michigan:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Michigan Consumer Protection Statute, Mich. Comp. Laws Ann. § 445.903, *et seq*.  Defendants agreed to, and did in fact, act in restraint of trade or commerce in Michigan, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Clomipramine were sold, distributed, or obtained in Michigan. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Clomipramine. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Clomipramine prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Clomipramine price competition was restrained, suppressed, and eliminated throughout Michigan; (2) generic Clomipramine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Michigan. During the Class Period, Defendants' illegal conduct had a substantial effect on Michigan commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Clomipramine, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic

Clomipramine at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of Mich. Comp. Laws Ann. § 445.903, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

219.    **Minnesota:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.43, *et seq*.  Defendants engaged in an unfair and deceptive trade practices during the course of their business dealings, which significantly impacted Plaintiffs as actual or potential consumers of the Defendants' goods and which caused Plaintiffs to suffer injury. Defendants took efforts to conceal their agreements from Plaintiffs. Defendants' unlawful conduct had the following effects: (1) generic Clomipramine price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) generic Clomipramine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Minnesota. During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce and consumers. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Minn. Stat. § 325D.43, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute and as equity demands.

220.    **Nebraska:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Nebraska Consumer Protection Act, Neb. Rev. Stat. § 59-1601, *et seq*.  Defendants' unlawful conduct had the following effects: (1) generic Clomipramine price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) generic Clomipramine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nebraska. During the Class Period, Defendants marketed, sold,

or distributed generic Clomipramine in Nebraska, and Defendants' illegal conduct substantially affected Nebraska commerce and consumers. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Neb. Rev. Stat. § 59-1601, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

221.    **Nevada:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. Ann. § 598.0903, *et seq*.  Defendants agreed to, and did in fact, act in restraint of trade or commerce in Nevada, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Clomipramine were sold, distributed, or obtained in Nevada. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Clomipramine. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Clomipramine prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Clomipramine price competition was restrained, suppressed, and eliminated throughout Nevada; (2) generic Clomipramine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nevada. During the Class Period, Defendants' illegal conduct had a substantial effect on Nevada commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of

generic Clomipramine, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Clomipramine at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of Nev. Rev. Stat. Ann. § 598.0903, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

222.    **New Hampshire:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Hampshire Consumer Protection Act, N.H. Rev. Stat. § 358-A:1, *et seq*.  Defendants' unlawful conduct had the following effects: (1) generic Clomipramine price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) generic Clomipramine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Hampshire. During the Class Period, Defendants marketed, sold, or distributed generic Clomipramine in New Hampshire, and Defendants' illegal conduct substantially affected New Hampshire commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. Rev. Stat. § 358-A:1, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

223.    **New Jersey:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Jersey Consumer Fraud Act, N.J. Statutes § 56:8-1, *et seq*.  Defendants agreed to, and did in fact, act in restraint of trade or commerce in New Jersey, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Clomipramine were sold, distributed, or obtained in New Jersey. Defendants deliberately failed to disclose material facts to Plaintiffs and

members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Clomipramine. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Clomipramine prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Clomipramine price competition was restrained, suppressed, and eliminated throughout New Jersey; (2) generic Clomipramine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Jersey. During the Class Period, Defendants' illegal conduct had a substantial effect on New Jersey commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Clomipramine, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Clomipramine at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of N.J. Statutes § 56:8-1, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

224.    **New Mexico:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of New Mexico Stat. Ann. § 57-12-1, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated levels, the prices at which generic Clomipramine were sold, distributed or obtained in New Mexico and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. The

aforementioned conduct on the part of Defendants constituted "unconscionable trade practices," in violation of New Mexico Stat. Ann. § 57-12-3, in that such conduct, *inter alia*, resulted in a gross disparity between the value received by Plaintiffs and members of the Damages Class and the prices paid by them for generic Clomipramine as set forth in New Mexico Stat. Ann. § 57-12-2E. Plaintiffs and members of the Damages Class were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. Defendants had the sole power to set that price, and Plaintiffs and members of the Damages Class had no power to negotiate a lower price. Moreover, Plaintiffs and members of the Damages Class lacked any meaningful choice in purchasing generic Clomipramine because they were unaware of the unlawful overcharge, and there was no alternative source of supply through which Plaintiffs and members of the Damages Class could avoid the overcharges. Defendants' conduct with regard to sales of generic Clomipramine, including their illegal conspiracy to secretly fix the price of generic Clomipramine at supracompetitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public. Defendants took grossly unfair advantage of Plaintiffs and members of the Damages Class. The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for consumers so that there was a gross disparity between the price paid and the value received for generic Clomipramine. Defendants' unlawful conduct had the following effects: (1) generic Clomipramine price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) generic Clomipramine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico. During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce and consumers. As a direct and proximate result of the unlawful conduct of Defendants,

Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of New Mexico Stat. Ann. § 57-12-1, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

225.    **New York:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which generic Clomipramine were sold, distributed or obtained in New York and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. Defendants and their co-conspirators made public statements about the prices of generic Clomipramine that either omitted material information that rendered the statements that they made materially misleading or affirmatively misrepresented the real cause of price increases for generic Clomipramine; and Defendants alone possessed material information that was relevant to consumers, but failed to provide the information. Because of Defendants' unlawful trade practices in the State of New York, New York class members who indirectly purchased generic Clomipramine were misled to believe that they were paying a fair price for generic Clomipramine or the price increases for generic Clomipramine were for valid business reasons; and similarly situated consumers were affected by Defendants' conspiracy. Defendants knew that their unlawful trade practices with respect to pricing generic Clomipramine would have an impact on New York consumers and not just Defendants' direct customers. Defendants knew that their unlawful trade practices with respect to pricing generic Clomipramine would have a broad impact, causing consumer class members who indirectly purchased generic Clomipramine to be injured by paying more for generic

Clomipramine than they would have paid in the absence of Defendants' unlawful trade acts and practices. The conduct of Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of consumers in New York State in an honest marketplace in which economic activity is conducted in a competitive manner. Defendants' unlawful conduct had the following effects: (1) generic Clomipramine price competition was restrained, suppressed, and eliminated throughout New York; (2) generic Clomipramine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York. During the Class Period, Defendants marketed, sold, or distributed generic Clomipramine in New York, and Defendants' illegal conduct substantially affected New York commerce and consumers. During the Class Period, each of Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed generic Clomipramine in New York. Plaintiffs and members of the Damages Class seek all relief available pursuant to N.Y. Gen. Bus. Law § 349(h).

226. **North Carolina:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which generic Clomipramine were sold, distributed or obtained in North Carolina and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. Defendants' price-fixing conspiracy could not have succeeded absent deceptive conduct by Defendants to cover up their illegal acts. Secrecy was integral to the formation, implementation and maintenance of Defendants' price-fixing conspiracy. Defendants committed inherently deceptive and self-

concealing actions, of which Plaintiffs and members of the Damages Class could not possibly have been aware. Defendants and their co-conspirators publicly provided pretextual and false justifications regarding their price increases. Defendants' public statements concerning the price of generic Clomipramine created the illusion of competitive pricing controlled by market forces rather than supracompetitive pricing driven by Defendants' illegal conspiracy. Moreover, Defendants deceptively concealed their unlawful activities by mutually agreeing not to divulge the existence of the conspiracy to outsiders. The conduct of Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of North Carolina consumers in an honest marketplace in which economic activity is conducted in a competitive manner. Defendants' unlawful conduct had the following effects: (1) generic Clomipramine price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) generic Clomipramine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina. During the Class Period, Defendants marketed, sold, or distributed generic Clomipramine in North Carolina, and Defendants' illegal conduct substantially affected North Carolina commerce and consumers. During the Class Period, each of Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed generic Clomipramine in North Carolina. Plaintiffs and members of the Damages Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation

of North Carolina Gen. Stat. § 75-1.1, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

227.    **North Dakota:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the North Dakota Unlawful Sales or Advertising Practices Statute, North Dakota Century Code § 51-15-01, *et seq*.  Defendants agreed to, and did in fact, act in restraint of trade or commerce in North Dakota, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Clomipramine were sold, distributed, or obtained in North Dakota. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Clomipramine. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Clomipramine prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Clomipramine price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) generic Clomipramine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Dakota. During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Clomipramine, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Clomipramine at prices set by a free and fair market. Defendants' misleading

conduct and unconscionable activities constitute violations of North Dakota Cent. Code § 51-15-01, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

228. **South Carolina:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of South Carolina Unfair Trade Practices Act, S.C. Code Ann. § 39-5-10, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Clomipramine price competition was restrained, suppressed, and eliminated throughout South Carolina; (2) generic Clomipramine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Carolina. During the Class Period, Defendants' illegal conduct had a substantial effect on South Carolina commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Ann. § 39-5-10, *et seq*., and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.

229. **South Dakota:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the South Dakota Deceptive Trade Practices and Consumer Protection Statute, S.D. Codified Laws Ann. § 37-24-1, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in South Dakota, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Clomipramine were sold, distributed, or obtained in South Dakota. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic

Clomipramine. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Clomipramine prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Clomipramine price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) generic Clomipramine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Dakota. Defendants' illegal conduct substantially affected South Dakota commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Clomipramine, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Clomipramine at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of generic Clomipramine they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. Codified Laws Ann. § 37-24-1, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

230. **West Virginia:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the West Virginia Consumer Credit and Protection Act, W.Va. Code § 46A-6-101, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes West Virginia, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic

Clomipramine were sold, distributed, or obtained in West Virginia. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Clomipramine. Defendants affirmatively misrepresented to all purchasers during the Class Period that Defendants' generic Clomipramine prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Clomipramine price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) generic Clomipramine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout West Virginia. Defendants' illegal conduct substantially affected West Virginia commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Clomipramine, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Clomipramine at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of generic Clomipramine they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of W.Va. Code § 46A-6-101, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

231.    **Wisconsin:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Wisconsin Consumer Protection

Statutes, Wisc. Stat. § 100.18, *et seq.*  Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Wisconsin, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Clomipramine were sold, distributed, or obtained in Wisconsin. Defendants affirmatively misrepresented to all purchasers during the Class Period that Defendants' generic Clomipramine prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Clomipramine price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) generic Clomipramine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Wisconsin. Defendants' illegal conduct substantially affected Wisconsin commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations concerning the price of generic Clomipramine, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Clomipramine at prices set by a free and fair market. Defendants' affirmative misrepresentations constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of generic Clomipramine they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Wisc. Stat. § 100.18, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

232.    **U.S. Virgin Islands:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the U.S. Virgin Islands Consumer Fraud and Deceptive Business Practices Act, 12A V.I.C. §§ 102, 301-35, *et seq*.  Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes U.S.V.I., by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Clomipramine were sold, distributed, or obtained in U.S.V.I. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Clomipramine. Defendants affirmatively misrepresented to all purchasers during the Class Period that Defendants' generic Clomipramine prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Clomipramine price competition was restrained, suppressed, and eliminated throughout U.S.V.I.; (2) generic Clomipramine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout U.S.V.I. Defendants' illegal conduct substantially affected U.S.V.I. commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above and are threatened with further injury. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Clomipramine, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Clomipramine at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost

of generic Clomipramine they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 12A V.I.C. §§ 102, 301-35, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute and as equity demands.

## FOURTH COUNT

### Unjust Enrichment[85]
### (on behalf of Plaintiffs and the Damages Class)

233.    Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

234.    To the extent required, this claim is pleaded in the alternative to the other claims in this Complaint. This claim is brought under the equity precedents of each of the IRP Damages Jurisdictions.

235.    Defendants have unlawfully benefited from their sales of generic Clomipramine because of the unlawful and inequitable acts alleged in this Complaint. Defendants unlawfully overcharged privately held pharmacies, who purchased generic Clomipramine at prices that were more than they would have been but for Defendants' unlawful actions.

236.    Defendants' financial benefits resulting from their unlawful and inequitable acts are traceable to overpayments by Plaintiffs and members of the Damages Class.

_____

[85] Unjust enrichment claims are alleged herein under the laws of Alabama, Alaska, Arizona, Arkansas, California, Colorado, Delaware, Florida, Georgia, Idaho, Illinois, Iowa, Kansas, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington, West Virginia, Wisconsin and Wyoming as well as the District of Columbia, Puerto Rico and the U.S. Virgin Islands.

237.    Plaintiffs and the Damages Class have conferred upon Defendants an economic benefit, in the nature of profits resulting from unlawful overcharges, to the economic detriment of Plaintiffs and the Damages Class.

238.    Defendants have been enriched by revenue resulting from unlawful overcharges for generic Clomipramine while Plaintiffs have been impoverished by the overcharges they paid for generic Clomipramine imposed through Defendants' unlawful conduct.  Defendants' enrichment and Plaintiffs' impoverishment are connected.

239.    There is no justification for Defendants' retention of, and enrichment from, the benefits they received, which caused impoverishment to Plaintiffs and the Damages Class, because Plaintiffs and the Damages Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges.

240.    Plaintiffs did not interfere with Defendants' affairs in any manner that conferred these benefits upon Defendants.

241.    The benefits conferred upon Defendants were not gratuitous, in that they constituted revenue created by unlawful overcharges arising from Defendants' illegal and unfair actions to inflate the prices of generic Clomipramine.

242.    The benefits conferred upon Defendants are measurable, in that the revenue Defendants have earned due to their unlawful overcharges of generic Clomipramine are ascertainable by review of sales records.

243.     It would be futile for Plaintiffs and the Damages Class to seek a remedy from any party with whom they have privity of contract. Defendants have paid no consideration to any other

person for any of the unlawful benefits they received indirectly from Plaintiffs and the Damages Class with respect to Defendants' sales of generic Clomipramine.

244.    It would be futile for Plaintiffs and the Damages Class to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which they indirectly purchased generic Clomipramine, as the intermediaries are not liable and cannot reasonably be expected to compensate Plaintiffs and the Damages Class for Defendants' unlawful conduct.

245.    The economic benefit of overcharges and monopoly profits derived by Defendants through charging supracompetitive and artificially inflated prices for generic Clomipramine is a direct and proximate result of Defendants' unlawful practices.

246.    The financial benefits derived by Defendants rightfully belong to Plaintiffs and the Damages Class, because Plaintiffs and the Damages Class paid supracompetitive prices during the Class Period, inuring to the benefit of Defendants.

247.    It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories of the United States, except Ohio and Indiana, for Defendants to be permitted to retain any of the overcharges for generic Clomipramine derived from Defendants' unlawful, unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

248.    Defendants are aware of and appreciate the benefits bestowed upon them by Plaintiffs and the Damages Class.  Defendants consciously accepted the benefits and continue to do so as of the date of this filing, as generic Clomipramine prices remain inflated above pre-conspiracy levels.

249.    Defendants should be compelled to disgorge in a common fund for the benefit of Plaintiffs and the Damages Class all unlawful or inequitable proceeds they received from their sales of generic Clomipramine.

250.    A constructive trust should be imposed upon all unlawful or inequitable sums received by Defendants traceable to indirect purchases of generic Clomipramine by Plaintiffs and the Damages Class. Plaintiffs and the Damages Class have no adequate remedy at law.

## XIV.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment for the following relief:

A.    The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable Notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Classes;

B.    That the unlawful conduct, contract, conspiracy, or combination alleged herein be adjudged and decreed: (a) an unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act; (b) a per se violation of Section 1 of the Sherman Act; (c) an unlawful combination, trust, agreement, understanding and/or concert of action in violation of the state antitrust and unfair competition and consumer protection laws as set forth herein; and (d) acts of unjust enrichment by Defendants as set forth herein.

C.    Plaintiffs and members of the Damages Class recover damages, to the maximum extent allowed under such state laws, and that a judgment in favor of Plaintiffs and members of the Damages Class be entered against Defendants jointly and severally in an amount to be trebled to the extent such laws permit;

D.      Plaintiffs and members of the Damages Class recover damages, to the maximum extent allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully obtained;

E.      Plaintiffs and members of the Damages Class be awarded restitution, including disgorgement of profits Defendants obtained as a result of their acts of unfair competition and acts of unjust enrichment, and the Court establish of a constructive trust consisting of all ill-gotten gains from which Plaintiffs and members of the Damages Class may make claims on a pro rata basis;

F.      Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

G.      Plaintiffs and members of the Classes be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate;

H.      Plaintiffs and members of the Classes recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

I.      Plaintiffs and members of the Classes have such other and further relief as the case may require and the Court may deem just and proper.

# XV.    JURY DEMAND

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil

Procedure, of all issues so triable.

Dated: August 15, 2017                            Respectfully submitted,

                                                  /s/  Jonathan W. Cuneo

Peter Gil-Montllor                                Jonathan W. Cuneo
Matthew Prewitt                                   Joel Davidow
**CUNEO, GILBERT & LADUCA LLP**                   Daniel Cohen
16 Court Street, Suite 1012                       Victoria Romanenko
Brooklyn, NY 11241                                Blaine Finley
202-789-3960                                      **CUNEO, GILBERT & LADUCA LLP**
pgil-montllor@cuneolaw.com                        4725 Wisconsin Ave., NW Suite 200
                                                  Washington, DC 20016
                                                  202-789-3960
                                                  jonc@cuneolaw.com

                                                  *Lead Counsel for the Indirect Reseller Plaintiffs*